IVAN M. GOLD (BAR NO. 121486)
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, California  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516
E-Mail:  igold@allenmatkins.com

Attorneys for landlord-creditor Camino Real Limited
Liability Company

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:24-bk-11569 |
| METROPOLITAN THEATRES CORPORATION, a California corporation, | Chapter 11 |
| Debtor. | **DECLARATION OF MARK D. LINEHAN SUPPORTING OBJECTION OF CAMINO REAL LIMITED LIABILITY COMPANY TO MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING** |
| | Date:   June 11, 2024<br>Time:   10:00 a.m.<br>Ctrm:   Courtroom 1668<br>           Edward R. Roybal Federal Building and<br>           Courthouse<br>           255 East Temple Street<br>           Los Angeles, CA 90012 |

I, MARK D. LINEHAN, declare:

1.      I am the managing member of Camino Real Limited Liability Company

("Landlord"), the owner of the retail development known as the Camino Real Marketplace, Goleta,

Santa Barbara County, California.  I am also the President of Wynmark Company, which performs

property management, accounting and leasing services with respect to the Camino Real

Marketplace on behalf of the Landlord.  My responsibilities include the leasing of retail premises

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**
4884-9383-4433.1

DECLARATION OF MARK D. LINEHAN SUPPORTING OBJECTION TO MOTION FOR ORDER
AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING

at the Camino Real Marketplace, together with the monitoring and collection of the performance of lease obligations by existing tenants.

2.     This declaration is submitted in opposition to the *Motion of Debtor and Debtor In Possession For Order Authorizing Debtor To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §364.*

3.     As a consequence of my position as both the managing member of Landlord and the President of Wynmark, I am one of the custodians of the books, records, and files of Camino Real Marketplace as those books, records, and files relate to the use and occupancy of theater premises commonly known as 7040 Marketplace Drive, Goleta, California, located in the Camino Real Marketplace, operated as Camino Real Cinemas.  If called upon to testify in this proceeding, as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

4.     The Camino Real Marketplace is an open-air retail development consisting of approximately 475,435 square feet of gross leaseable area.  Camino Real Marketplace has over twenty retail stores and restaurants, including well-known retailers such as Best Buy, BevMo!, Costco, Home Depot, HomeGoods, Ross Dress for Less, Staples and Ulta Beauty, eleven restaurants, the Camino Real Cinemas, and shared parking areas with over 2,500 parking spaces.

5.     On or about January 15, 1999, Landlord, as landlord, and debtor Metropolitan Theatres Corporation, as tenant, entered into a written Shopping Center Lease (the "Lease") for an approximately 21,900 square foot theatre in the Camino Real Marketplace, commonly known as the Camino Real Cinemas, 7040 Marketplace Drive, as more particularly described in the Lease. The term of the Lease is currently scheduled to expire on February 28, 2025, with an additional tenant option to further extend the term.  A true and correct copy of the Lease is attached hereto as Exhibit "1" and incorporated herein by this reference. I signed the Lease on behalf of Landlord.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4884-9383-4433.1

-2-

DECLARATION OF MARK D. LINEHAN SUPPORTING OBJECTION TO MOTION FOR ORDER
AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on May 24, 2024 at

_____.

_____
Mark D. Linehan

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4884-9383-4433.1

DECLARATION OF MARK D. LINEHAN SUPPORTING OBJECTION TO MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING

# EXHIBIT A

ORIGINAL

SHOPPING CENTER LEASE

BY AND BETWEEN

CAMINO REAL LIMITED LIABILITY COMPANY

AS Landlord

AND

METROPOLITAN THEATRES CORPORATION

AS TENANT

## TABLE OF CONTENTS

PAGE

1.  DEFINITIONS  . . . . . . . . . . . . . . . . . . . . . . 1
    1.1.   Building  . . . . . . . . . . . . . . . . . . . . 1
    1.2.   Common Area . . . . . . . . . . . . . . . . . . . 1
    1.3.   Common Area Maintenance Costs . . . . . . . . . . 1
    1.4.   Environmental Laws  . . . . . . . . . . . . . . . 3
    1.5.   Event of Default  . . . . . . . . . . . . . . . . 3
    1.6.   Gross Leasable Area . . . . . . . . . . . . . . . 4
    1.7.   Gross Receipts  . . . . . . . . . . . . . . . . . 4
    1.8.   Hazardous Materials . . . . . . . . . . . . . . . 5
    1.9.   Interest  . . . . . . . . . . . . . . . . . . . . 6
    1.10.  Lease Year  . . . . . . . . . . . . . . . . . . . 6
    1.11.  Management Fee  . . . . . . . . . . . . . . . . . 6
    1.12.  Parking Area  . . . . . . . . . . . . . . . . . . 6
    1.13.  Permittee . . . . . . . . . . . . . . . . . . . . 6
    1.14.  Percentage Rent . . . . . . . . . . . . . . . . . 6
    1.15.  Premises  . . . . . . . . . . . . . . . . . . . . 6
    1.16.  Property  . . . . . . . . . . . . . . . . . . . . 7
    1.17.  Proportionate Share . . . . . . . . . . . . . . . 7
    1.18.  Release . . . . . . . . . . . . . . . . . . . . . 7
    1.19.  Rent  . . . . . . . . . . . . . . . . . . . . . . 7
    1.20.  Security Deposit  . . . . . . . . . . . . . . . . 7
    1.21.  Shopping Center . . . . . . . . . . . . . . . . . 7
    1.22.  Taxes . . . . . . . . . . . . . . . . . . . . . . 7
    1.23.  Term Commencement Date  . . . . . . . . . . . . . 8
    1.24.  Term Expiration Date  . . . . . . . . . . . . . . 9

2.  LEASE OF PREMISES; LANDLORD'S RESERVED RIGHTS; GROUND LEASE;
    TENANT'S RIGHT TO TERMINATE LEASE. . . . . . . . . . . . 9
    2.1.   Demise of Premises  . . . . . . . . . . . . . . . 9
    2.2.   Landlord's Reserved Rights  . . . . . . . . . . . 9
    2.3.   Tenant's Use of Building Roof . . . . . . . . . . 9
    2.4.   Determination of Gross Leasable Area of Premises  10
    2.5.   Lease Subject to Ground Lease . . . . . . . . . . 10
    2.6.   Adjustment of Gross Leasable Area of Premises.    10

3.  TERM . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    3.1.   Duration; Effective Date  . . . . . . . . . . . . 11
    3.2.   Certificate . . . . . . . . . . . . . . . . . . . 11
    3.3.   Holding Over  . . . . . . . . . . . . . . . . . . 11
    3.4.   Options to Extend.  . . . . . . . . . . . . . . . 12
           3.4.1.  Grant of Options  . . . . . . . . . . . . 12
           3.4.2.  Manner of Exercise  . . . . . . . . . . . 12
           3.4.3.  Terms and Rent  . . . . . . . . . . . . . 12
           3.4.4.  Options Personal  . . . . . . . . . . . . 12

4.  RENT . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.1.   Fixed Minimum Rent  . . . . . . . . . . . . . . . 12
    4.2.   Percentage Rent . . . . . . . . . . . . . . . . . 13
           4.2.1.  Annual Statements and Payment . . . . . . 13
           4.2.2.  Quarterly Statements  . . . . . . . . . . 13
           4.2.3.  Books and Records . . . . . . . . . . . . 14

            4.2.4.   Inspection and Audit . . . . . . . . . 14
    4.3.   Additional Rent . . . . . . . . . . . . . . 15
    4.4.   Late Charge . . . . . . . . . . . . . . . . 15

5.   PERMISSIBLE USE; TENANT'S COVENANT TO OPEN; LANDLORD'S RIGHT
    TO TERMINATE LEASE; TENANT'S CONDUCT OF BUSINESS . . . 15
    5.1.   Use . . . . . . . . . . . . . . . . . . . 15
    5.2.   Tenant's Opening Covenant . . . . . . . . . 17
    5.3.   Landlord's Right to Terminate Lease on Tenant's
         Cessation of Operations . . . . . . . . . . 18
    5.4.   Compliance With Laws . . . . . . . . . . . 18
    5.5.   Use Limitations and Requirements . . . . . 19
    5.6.   Compliance With Conditions of Approval . . . . 20
    5.7.   Compliance with Declaration . . . . . . . . . 20
    5.8.   Tenant's Exclusive . . . . . . . . . . . . 21
    5.9    Tenant's Covenant Re: Stadium Seating
         in Other Tenant Theatres . . . . . . . . . 21

6.   INSURANCE . . . . . . . . . . . . . . . . . . . 22
    6.1.   Tenant's Insurance . . . . . . . . . . . . 22
            6.1.1.   Liability Insurance . . . . . . . 22
            6.1.2.   Workers Compensation Insurance . . 23
            6.1.3.   Tenant's Property Insurance . . . . 23
    6.2.   Landlord's Insurance . . . . . . . . . . . 23
            6.2.1.   Property Insurance . . . . . . . 23
            6.2.2.   Liability Insurance . . . . . . . . 24
    6.3.   Policy Requirements . . . . . . . . . . . 24
    6.4.   Blanket Coverage . . . . . . . . . . . . 24
    6.5.   Waiver of Subrogation . . . . . . . . . . . 25

7.   TAXES . . . . . . . . . . . . . . . . . . . . 25
    7.1.   Tenant's Payment of Common Taxes . . . . . . . 25
    7.2.   Tenant's Payment of Taxes Relating to Premises   25

8.   CONSTRUCTION . . . . . . . . . . . . . . . . . . 26
    8.1.   Initial Construction . . . . . . . . . . . 26
    8.2.   Acceptance of Premises . . . . . . . . . . 26

9.   REPAIRS AND MAINTENANCE; ALTERATIONS . . . . . . . . 26
    9.1.   By Landlord . . . . . . . . . . . . . . . 26
    9.2.   By Tenant . . . . . . . . . . . . . . . . 26
    9.3.   Alterations by Tenant . . . . . . . . . . . 27
    9.4.   Construction Requirements . . . . . . . . . 27
    9.5.   Mechanics' Liens . . . . . . . . . . . . . 28
    9.6.   Waivers . . . . . . . . . . . . . . . . . 29

10.   UTILITIES . . . . . . . . . . . . . . . . . . . 29

11.   ADVERTISING, SIGNS AND DISPLAYS . . . . . . . . . 30
    11.1.   Premises Signs and Other Advertising Media . . 30
    11.2.   Tenant's Sign on Pylon . . . . . . . . . . 30
    11.3.   Off-Premises Displays and Advertising . . . . . 31
    11.4.   Advertising and Promotion . . . . . . . . . 31
            11.4.1.   Shopping Center Promotions . . . . 31
            11.4.2.   Promotion Fee . . . . . . . . . 31

        11.4.3.   Christmas Promotions . . . . . . . . .   32

12.  COMMON AREA   . . . . . . . . . . . . . . . . . .   32
     12.1   Maintenance and Repair  . . . . . . . . . .   32
     12.2.  Payment by Tenant of Proportionate Share  . . .   32
            12.2.1.   Method of Payment  . . . . . . . .   32
            12.2.2.   Adjustments During Lease Year  . . . .   33
            12.2.3.   Prorations . . . . . . . . . .   33
            12.2.4.   Landlord's Records . . . . . . . . .   33
     12.3.  Non-Exclusive Rights in Common Area; Rules and
            Regulations . . . . . . . . . . . . . . . .   33
     12.4.  Tenant Parking  . . . . . . . . . . . . . .   34
     12.5.  Changes to Shopping Center  . . . . . . . . .   34
     12.6.  Alternative Common Area Maintenance Provisions   34

13.  ASSIGNMENT AND SUBLETTING   . . . . . . . . . . . .   35
     13.1.  Landlord Consent Required . . . . . . . . .   35
     13.2.  Rent  . . . . . . . . . . . . . . . . . . .   35
     13.3.  Payment of Consideration to Landlord  . . . . .   35
     13.4.  Parameters of Landlord's Consent  . . . . . .   36
     13.5.  Other Terms and Conditions  . . . . . . . .   36
     13.6.  Landlord Rights and Remedies  . . . . . . .   37
     13.7.  Permitted Assignments/Subleases . . . . . . .   37
     13.8.  Encumbrances  . . . . . . . . . . . . . . .   38

14.  ACCESS . . . . . . . . . . . . . . . . . . . . .   38
     14.1.  Access to Premises  . . . . . . . . . . . .   38
     14.2.  Access for Prospective Tenants  . . . . . . .   38

15.  EMINENT DOMAIN . . . . . . . . . . . . . . . . .   39
     15.1.  Entire or Substantial Taking  . . . . . . . .   39
     15.2.  Partial Taking  . . . . . . . . . . . . . .   39
     15.3.  Disposition of Award  . . . . . . . . . . .   39
     15.4.  Further Assurance . . . . . . . . . . . . .   40
     15.5.  Tenant Waivers  . . . . . . . . . . . . . .   40

16.  DAMAGE OR DESTRUCTION   . . . . . . . . . . . . .   40
     16.1.  Landlord to Rebuild . . . . . . . . . . . .   40
     16.2.  Landlord's Options to Terminate . . . . . . .   40
            16.2.1.   Damage to Premises . . . . . . . .   40
            16.2.2.   Damage to Balance of Shopping Center .   41
     16.3.  Extent of Landlord's Repair and Rebuilding
            Obligations . . . . . . . . . . . . . . . .   41
     16.4.  Tenant's Termination Rights . . . . . . . .   41
     16.5.  Tenant Waivers  . . . . . . . . . . . . . .   42

17.  WAIVER OF CLAIMS; INDEMNITY . . . . . . . . . . .   42
     17.1.  Waiver of Claims  . . . . . . . . . . . . .   42
     17.2.  Indemnity . . . . . . . . . . . . . . . . .   42

18.  NOTICES  . . . . . . . . . . . . . . . . . . . .   43
     18.1.  Procedure . . . . . . . . . . . . . . . . .   43
     18.2.  Multiple Tenants  . . . . . . . . . . . . .   43

19.  DEFAULT AND REMEDIES . . . . . . . . . . . . . .   44

19.1.  Notice to Tenant . . . . . . . . . . . . . 44
    19.1.1.  Vacation or Abandonment . . . . . 44
    19.1.2.  Nonpayment of Money . . . . . . 44
    19.1.3.  Other Obligations . . . . . . . 44
19.2.  Landlord's Remedies . . . . . . . . . . . 44
19.3.  Damages Upon Termination . . . . . . . . 45
19.4.  Computation of Rent and Other Amounts for
    Purposes of Default . . . . . . . . . . . 45
19.5.  Waiver of Statutory Notice Periods . . . . . 45
19.6.  Landlord's Right to Perform on Tenant's Breach 46
19.7.  Receiver . . . . . . . . . . . . . . . . . 46
19.8.  Landlord's Defaults . . . . . . . . . . . 46
    19.8.1.  Notice and Cure; Landlord's
    Liability; Tenant's Right of Cure and Offset . 46
    19.8.2.  Limitations on Tenant's Remedies . . . 47
    19.8.3.  Waivers . . . . . . . . . . . . 48
19.9.  Waiver; Remedies Cumulative . . . . . . . 48
19.10.  Interest . . . . . . . . . . . . . . . . 48
19.11.  No Accord and Satisfaction . . . . . . . 48
19.12.  Waiver of Right of Redemption . . . . . . 49

20.  SUBORDINATION AND ATTORNMENT; ESTOPPEL CERTIFICATES . 49
20.1.  Subordination . . . . . . . . . . . . . . 49
20.2.  Attornment by Tenant . . . . . . . . . . 50
20.3.  Subordination to Further Covenants and
    Easements . . . . . . . . . . . . . . . . 50
20.4.  Estoppel Certificates . . . . . . . . . . 50

21.  INTENTIONALLY OMITTED . . . . . . . . . . . . 51

22.  SURRENDER OF PREMISES ON TERMINATION . . . . . . . 51
22.1.  Condition of Premises . . . . . . . . . . 51
22.2.  Effect of Surrender on Subleases . . . . . 52

23.  SALE OF PREMISES BY LANDLORD . . . . . . . . . 52

24.  BROKERS . . . . . . . . . . . . . . . . . . 52

25.  HAZARDOUS MATERIALS . . . . . . . . . . . . . 52
25.1.  Landlord's Representations . . . . . . . 52
25.2.  Tenant's Obligations . . . . . . . . . . 53
    25.2.1.  Covenants . . . . . . . . . . . 53
    25.2.2.  Indemnification . . . . . . . . 53
25.3.  Landlord's Obligations with Respect to
    Hazardous Materials . . . . . . . . . . . 53

26.  GENERAL PROVISIONS . . . . . . . . . . . . . 54
26.1.  No Partnership . . . . . . . . . . . . . 54
26.2.  Binding on Successors . . . . . . . . . . 54
26.3.  Attorneys' Fees . . . . . . . . . . . . 55
26.4.  Governing Law . . . . . . . . . . . . . 55
26.5.  Force Majeure . . . . . . . . . . . . . 55
26.6.  Construction and Interpretation . . . . . 55
26.7.  Entire Agreement; Amendment . . . . . . . 56
26.8.  References . . . . . . . . . . . . . . . 56

26.9.    Warranties of Authority  . . . . . . . . . . .  56
26.10.   Severability . . . . . . . . . . . . . . . . .  56
26.11.   Other Tenancies  . . . . . . . . . . . . . . .  57
26.12.   Time of Essence  . . . . . . . . . . . . . . .  57
26.13.   Survival . . . . . . . . . . . . . . . . . . .  57
26.14.   Recordation  . . . . . . . . . . . . . . . . .  57

Exhibits

Exhibit A - Site Plan of Shopping Center

Exhibit B - Legal Description of Property

Exhibit C - Work Letter Agreement

Exhibit D - Conditions of Approval

Exhibit E - Ground Lessor's Non-Disturbance and Attornment
            Agreement

Exhibit F - Landlord's Lenders' Subordination,
            Non-Disturbance and Attornment Agreement

Exhibit G - Memorandum of Lease

## SHOPPING CENTER LEASE

THIS SHOPPING CENTER LEASE (the "Lease") is made and entered into as of _January 15_ , 1999, by CAMINO REAL LIMITED LIABILITY COMPANY, a California limited liability company ("Landlord"), and METROPOLITAN THEATRES CORPORATION, a California corporation ("Tenant").

IN CONSIDERATION OF THE MUTUAL COVENANTS AND AGREEMENTS CONTAINED HEREIN, THE PARTIES AGREE AS FOLLOWS:

1. DEFINITIONS. Certain terms used in this Lease and Exhibits hereto shall have the meaning set forth below for each such term. Certain other terms shall have the meaning set forth elsewhere in this Lease and the Exhibits hereto.

1.1. Building: The building in which the Premises shall be located which Landlord is to construct on the Property approximately in the location shown on the Site Plan of the Shopping Center attached hereto as Exhibit A, with an anticipated Gross Leasable Area of approximately 90,000 square feet.

1.2. Common Area: All areas and facilities within the Shopping Center not appropriated to the exclusive occupancy of tenants, including all Parking Area, sidewalks, pedestrian ways, driveways, signs, service delivery facilities, common storage areas, common utility facilities and all other areas in the Shopping Center established by Landlord for non-exclusive use.

1.3. Common Area Maintenance Costs: The total of all costs and expenses paid or incurred by Landlord in connection with the operation, maintenance, ownership and repair of the Common Area. Without limiting the generality of the foregoing, Common Area Maintenance Costs include all costs of and expenses for: (i) maintenance and repairs of the Common Area; (ii) repaving, resurfacing, resealing, remarking, painting or restriping the Parking Area; (iii) maintenance and repair of all public or common facilities and installations such as public toilets, music program equipment and loudspeakers, customer accommodation facilities and similar installations; (iv) maintenance and repair of sidewalks, curbs, paving, walkways, Parking Area (including the matters in clause (ii) above), Shopping Center signs, landscaping (including periodic replacement of plants and shrubs), planting and irrigation systems, trash facilities, lighting, drainage and common utility facilities, directional or other signs, markers and bumpers; (v) all charges, wages, salaries, benefits and payroll burden fees of all parties (including affiliates of Landlord) providing services for the maintenance, repair, management and/or supervision of the Shopping Center, and for security personnel retained by Landlord in connection with the operation and maintenance of the Common Area (although Landlord shall not be required to obtain security services); (vi) maintenance and repair of security systems and alarms; (vii) depreciation or amortization (or in lieu thereof, rental payments) on all tools, equipment and machinery used in the operation and maintenance of the Common Area; (viii) premiums for

- 1 -

the insurance carried by Landlord pursuant to <u>Section 6.2</u> (and any deductible under such insurance which Landlord incurs or pays following an insured casualty); (ix) Taxes and all personal property or real property taxes and assessments levied or assessed on the Shopping Center, or any portion thereof or interest therein; (x) cleaning, collection, storage and removal of trash, rubbish, dirt and debris, and sweeping and cleaning the Common Area; (xi) maintenance, repair and replacement of Christmas and other seasonal decorations; (xii) servicing and maintaining and monitoring any fire sprinkler system; (xiii) any alterations, additions or improvements required to be made to the Common Area in order to comply with applicable laws, ordinances, rules, regulations and orders which were not applicable to the Common Areas as of the later of the Term Commencement Date or the date of completion of the Common Areas; (xiv) the amount of $35,000 per year which Landlord is required to pay for five (5) years under the Conditions of Approval (as defined in <u>Section 5.6</u> below) to fund the operations and maintenance of an electric shuttle bus from the University of California, Santa Barbara to the Shopping Center; (xv) all costs which Landlord is required to pay under the Declaration (as defined in <u>Section 5.7</u> below) with respect to the operation, maintenance and repair of the Storm Drainage System and Detention Basin (as such terms are defined in the Declaration); (xvi) all costs which Landlord incurs in operating, maintaining and repairing shower and locker facilities for bicyclists and in providing transit and carpool subsidies for employees of occupants of the Shopping Center under the Conditions of Approval; and (xvii) any other cost or expense which this Lease expressly provides may or shall be included within Common Area Maintenance Costs. For the purpose of Common Area Maintenance Costs, the cost of any capital improvements or other capital expenditure incurred by Landlord in connection with the operation and maintenance of the Common Area, plus Interest, shall be amortized over the useful life of the improvement and only such amortized amount shall be included in Common Area Maintenance Costs for each year over which such costs are amortized. Notwithstanding the foregoing, Common Area Maintenance Costs shall not include the cost of or expenses for the following: (A) leasing commissions, attorneys' fees or other costs or expenses incurred in connection with negotiations or disputes with other tenants of the Shopping Center, or legal fees incurred in connection with this Lease; (B) depreciation of buildings in the Shopping Center; (C) payments of principal, interest, late fees, prepayment fees or other charges on any debt secured by a mortgage covering the Shopping Center, or rental payments under any ground lease or underlying lease; (D) any penalties incurred due to Landlord's violation of any governmental rule or authority (but not excluding the cost of compliance therewith, if such cost is chargeable to Tenant pursuant to this Lease); (E) costs of a capital nature, including but not limited to, capital improvements, equipment, replacements, alterations and additions, except to the extent such costs reduce other Common Area Maintenance Costs or were incurred pursuant to clauses (ii), (iv) or (xiii) above; (F) rentals for items which if purchased, rather than rented, would constitute a capital improvement or equipment the cost of which is excluded from Common Area Maintenance Costs; (G) costs incurred with respect to the installation of tenant

- 2-

improvements or in improving, decorating, painting or redecorating space for tenants or other occupants of the Shopping Center; (H) marketing and promotional costs, brokerage commissions, and other costs incurred in connection with the negotiation of leases in the Shopping Center; (I) costs and fees paid to Landlord or to any affiliate of Landlord for services or goods to the extent the same exceeds the costs and fees which would have been incurred if such services and goods were provided by unaffiliated parties; (J) Landlord's general corporate overhead and general and administrative expenses; (K) salaries of employees or affiliates of Landlord, except for personnel time spent in the management and operation of the Shopping Center (provided such position is not higher in rank than building manager) and not typically included in the management fee being paid and included in Common Area Maintenance Costs; (L) costs incurred to comply with laws relating to the removal, remediation, containment or treatment of hazardous materials; (M) costs arising from the negligence or intentional acts of Landlord or its employees or agents, or any other tenant, vendor or contractor; (N) reserves for bad debts or lost rent; (O) costs incurred in connection with the original design, permitting or construction of the Shopping Center, including any costs incurred to receive governmental entitlements, approvals or permits for the Shopping Center; (P) entertainment and travel expenses, expenses for dues or membership fees to organizations or affiliations, and political or charitable contributions; and (Q) any expenses or costs incurred in connection with the ownership, operation or management of any interior plaza areas of the Shopping Center.

**1.4. Environmental Laws:** All statutes, ordinances, orders, rules and regulations of all federal, state or local governmental agencies relating to the use, generation, manufacture, installation, Release, discharge, storage or disposal of Hazardous Materials.

**1.5. Event of Default:** The occurrence of any of the following:

(a) **Vacation or Abandonment.** Vacation or abandonment of the Premises for a continuous period in excess of ten (10) days. Vacation shall not mean merely non-operation of the Premises, but an actual surrender of possession of the Premises by Tenant.

(b) **Nonpayment of Money.** Failure to pay when due Fixed Minimum Rent, Percentage Rent or any other charge or sum due and payable by Tenant under this Lease.

(c) **Prohibited Assignment or Subletting.** The making by Tenant of any assignment or sublease in contravention of the terms and conditions of Article 13.

(d) **Insolvency.** The admission by Tenant in writing of its inability to pay its debts as they become due; the filing by Tenant of a petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar

- 3 -

relief under any present or future statute, law or regulation, the filing by Tenant of an answer admitting or failing timely to contest a material allegation of a petition filed against Tenant in any such proceedings or, if within sixty (60) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceeding shall not have been dismissed; the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Tenant; a general assignment by Tenant for the benefit of creditors; any action or proceeding commenced by Tenant under any insolvency or bankruptcy act or under any other statute or regulation having as its purpose the protection of creditors, or any such action commenced against Tenant and not discharged within sixty (60) days after the date of commencement; or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets or the Premises, if such attachment or other seizure remains undismissed or undischarged for a period of sixty (60) days after the levy thereof.

(e)   <u>Other Obligations</u>.   Failure to perform any other term, obligation, covenant or agreement under this Lease.

1.6.   <u>Gross Leasable Area</u>:  The number of square feet of all areas in the Shopping Center appropriated to the exclusive use or occupancy of Shopping Center tenants or owner/occupants, whether or not such areas are actually leased or occupied, measured from the exterior surface of exterior walls (and extensions thereof for openings), and/or from the center line of party or common walls or demising partitions.   Notwithstanding the foregoing, none of the following areas shall be included in the calculation of the Gross Leasable Area of the Premises: (i) any canopies (or the area under such canopies) extending from the walls of the Premises, (ii) any mezzanines(except if and to the extent specified in <u>Section 2.6</u> below), and (iii) any automated ticket machines set up with Landlord's consent within the Shopping Center, but outside the Premises, for the sale of tickets to motion pictures presented in the Premises.

1.7.   <u>Gross Receipts</u>:  The total revenues from the sale in, at or from the Premises of admission tickets and concession items (including candy, drinks, popcorn, hot dogs, t-shirts, posters and any and all other food, drinks or merchandise) and any other goods or merchandise and from the performance of any service in, at or from the Premises which are received by Tenant or any Permittee of Tenant during any Lease Year in the form of cash, credit or otherwise, without deduction for uncollectible or uncollected amounts, including, without limitation, all revenues from the sale of tickets for films shown or presented in or at the Premises regardless of whether the sales generating such revenues were made on or off the Premises and regardless of how the sales were made (i.e., irrespective of whether the sales were made by mail, telephone, computer or other telecommunications medium, telegraph or otherwise) and regardless of whether the revenues were received at or in the Premises; PROVIDED, HOWEVER, there shall be

- 4 -

deducted from such receipts in the computation of Gross Receipts
(but only if and to the extent the same are included in Gross
Receipts): (a) the net amount of any bona fide credits or refunds
made to customers; (b) all federal, state, county and city taxes,
admission taxes and sales taxes which are paid by Tenant to the
taxing authority and which are (i) added to the ticket price or
sales price, as the case may be, or separately stated, and (ii)
collected from customers; (c) receipts from the sale of student and
senior citizens cards (provided that the actual admission charges
received from student and senior citizen discount card holders
shall be included in Gross Receipts; and provided further that the
amount excluded in any Lease Year pursuant to this clause (c) shall
in no event exceed two percent (2%) of total Gross Receipts for
such Lease Year; (d) proceeds from the sale of Tenant's furniture,
fixtures and equipment which are not stock in trade and other than
in the ordinary course of business; (e) receipts from the sale of
admission tickets (which receipts do not accrue to Tenant) with
respect to programs or performances controlled or presented under
a short-term license arrangement (provided that any amounts paid by
any such licensee to Tenant in connection with any such arrangement
shall be included); (f) receipts from any refreshment or other
vending machines, or other electronic or other game machines, which
are not owned by Tenant (provided that the net proceeds (as
commission, rental or otherwise) received by Tenant with respect to
any such machines located in the Premises shall be included); and
(g) agency commissions paid to independent third parties for
selling tickets and surcharges in excess of the standard ticket
price (or fees paid by Tenant to the credit card company) for
tickets purchased by use of credit cards.  For purposes of the
foregoing definition of "Gross Receipts" and the other provisions
of this Lease regarding Percentage Rent (except for clauses (e) and
(f) above), all references to "Tenant" includes each Permittee, and
"Gross Receipts" includes all items, categories and exclusions set
forth above with respect to any such Permittee.  Landlord and
Tenant understand and agree that from time to time a distributor
will release what the distributor considers to be an exceptional
motion picture wherein the exhibitor, if it hopes to obtain such
film, will represent that it will charge a distributor-suggested
admission price which may be in excess of admission prices
customarily charged at the Premises.  It is hereby agreed that in
those instances where the Tenant shall charge a distributor-
suggested admission price for such a motion picture which exceeds
the admission price customarily charges at the Premises, Tenant may
deduct from Gross Receipts the amount by which the distributor-
suggested admission charge under the above-described circumstances
shall exceed the normal admission price customarily charged, but
only to the extent that such increased admission price is paid to
the distributor of the motion picture.  Landlord agrees not to
divulge to any person or entity the amount of Gross Receipts made
by Tenant in the Premises, except to an existing or *bona fide*
prospective mortgagee or purchaser of the Premises which agrees to
keep such information confidential.

1.8.   Hazardous Materials:  Petroleum, asbestos,
polychlorinated biphenyls, radioactive materials, radon gas or any
chemical, material or substance defined as or included in the

- 5-

F:\DATA\VERGES\WYNMARK\METRO\LEASE.8.wpd

definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste" or "toxic substances", or words of similar import, under any applicable laws, including but not limited to, Federal Water Pollution Act, as amended (33 U.S.C. ' 1251 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. ' 6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. ' 9601 et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. ' 1801 et seq.), Sections 25115, 25117, 25122.7, 25140, 25249.8, 25281, 25316 and 25501 of the California Health and Safety Code, and Section 12000 et seq. of the California Code of Regulations, Division 2, Title 22, and any other waste, material or substance which constitutes a Hazardous Material under the Declaration (as defined in <u>Section 5.7</u> below).

 1.9. <u>Interest</u>: Ten percent (10%) per annum, but not to exceed the maximum rate allowed by applicable law.

 1.10. <u>Lease Year</u>: Each period during the Term commencing on January 1 and ending on December 31 next succeeding, except that the first Lease Year shall commence on the Term Commencement Date and end on December 31 next succeeding, and the last Lease Year shall end on the Term Expiration Date; provided, however, that Landlord shall have the right to designate Lease Years on a different basis (i.e., other than a calendar year basis), upon thirty (30) days' prior written notice to Tenant, as long as such designation does not increase Tenant's obligations or costs under this Lease.

 1.11. <u>Management Fee</u>: A fee equal to ten percent (10%) of Tenant's Proportionate Share of the total Common Area Maintenance Costs for the Lease Year in question, as payment to Landlord for its internal administration and overhead costs incurred in the operation and management of the Common Area hereunder.

 1.12. <u>Parking Area</u>: All Common Area (except sidewalks and service delivery facilities) now or hereafter designated by Landlord for the parking or access of motor vehicles, including roads, traffic lanes, vehicular parking spaces, landscaped areas and walkways.

 1.13. <u>Permittee</u>: Any subtenant, licensee, concessionaire of Tenant or any other person or entity from time to time entitled to the use or occupancy of any portion of the Premises by any agreement with Tenant.

 1.14. <u>Percentage Rent</u>: The amount by which eight percent (8%) of Tenant's Gross Receipts for each Lease Year exceeds the Fixed Minimum Rent paid by Tenant to Landlord for such Lease Year.

 1.15. <u>Premises</u>: The space, containing not more than 21,900 square feet of Gross Leasable Area (unless adjusted pursuant

- 6 -

to Section 2.4 or Section 2.6 below), located in the Building substantially as shown on Exhibit A.

1.16. Property: That certain real property on which the Shopping Center is located as described on Exhibit B.

1.17. Proportionate Share: Unless otherwise specified in this Lease, whenever Tenant is required to pay its Proportionate Share, such Proportionate Share shall be the ratio (expressed as a percentage) which the number of square feet of Gross Leasable Area in the Premises bears to the total number of square feet of constructed Gross Leasable Area in the Shopping Center; however, if portions of the Shopping Center are taxed, maintained or in some other way managed or treated separately with respect to costs of which Tenant is to pay a portion, then the denominator used for calculating Tenant's Proportionate Share shall be the total number of square feet of constructed Gross Leasable Area contained in that portion of the Shopping Center in which the Premises are included for purposes of such taxes, maintenance or other matters.  For example, if certain portions of the Shopping Center were separately assessed for tax purposes, then the denominator used for Tenant's Proportionate Share would be the total number of square feet of constructed Gross Leasable Area contained in that Shopping Center property which is included in the same tax bill as the Premises. If the Shopping Center is expanded or contracted, then as of the date of completion of such expansion or contraction, Tenant's Proportionate Share shall be adjusted, pursuant to the foregoing formula, to reflect any increased or decreased amount of Gross Leasable Area contained in the Shopping Center.

1.18. Release: As used in Article 25 ("Hazardous Materials"), disposal or placement or existence of any Hazardous Materials in, on, about or under the Premises or Shopping Center in violation of any Environmental Laws.

1.19. Rent: Fixed Minimum Rent, Percentage Rent and all other sums and amounts payable by Tenant hereunder as additional rent.

1.20. Security Deposit: Intentionally omitted.

1.21. Shopping Center: The Shopping Center constructed or to be constructed by Landlord on the Property, including all improvements from time to time or at any time located on the Property.

1.22. Taxes: The following: (i) all real estate taxes and assessments and all other taxes relating to or levied, assessed or imposed on the Shopping Center or any portion thereof or interest therein; (ii) all other taxes, assessments, charges, levies, or fees, general or special, ordinary or extraordinary, unforeseen as well as foreseen, of any kind and nature imposed, levied or assessed by any governmental authority or other entity either directly or indirectly (A) for public improvements or services, including such services as police or fire protection, street or sidewalk maintenance and repairs, street landscaping

- 7 -

maintenance and repairs and refuse collection, (B) upon or with respect to the development, possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of, or business operations in, the Shopping Center, (C) upon, against or measured by the area of the Shopping Center or uses made thereof or leases made to tenants thereof, and (D) for the protection or enhancement of public health or safety or the environment, including any tax, fee or other charge which is imposed with respect to air pollution, storm runoff or motor vehicle traffic reduction or control; (iii) any tax or excise, however described, imposed in addition to, or in substitution partially or totally of, any or all of the foregoing taxes, assessments, charges or fees; and (iv) any and all costs, expenses and attorneys' fees paid or incurred by Landlord in connection with any proceeding or action to contest in whole or in part, formally or informally, the imposition, collection or validity of any of the foregoing taxes, assessments, charges or fees.  If by law any Tax may be paid in installments at the option of the taxpayer, then Landlord shall include within Taxes hereunder only those installments (including interest, if any) which would become due by exercise of such option.  Taxes shall not include any taxes, assessments or charges for which Tenant is directly responsible under <u>Section 7.2</u> or Landlord's net income taxes, franchise taxes or inheritance taxes. Taxes shall also exclude (i) traffic impact mitigation fees or exactions, (ii) any Mello-Roos or similar assessment and any other fee, tax or exaction imposed as a condition to or in connection with the development and/or receipt of governmental approvals or entitlements for the development or alteration of the Shopping Center, or (iii) any increase in Taxes to the extent attributable to the second sale or exchange by Landlord of its leasehold interest under the Ground Lease (as defined in <u>Section 2.4</u> below) which is consummated within the period starting on the date of this Lease and ending on the day before the fifth anniversary of such day or within any period of five (5) consecutive years thereafter during the Lease Term.  Notwithstanding any contrary provision of this <u>Section 1.22</u>, no tax described herein shall be included in Taxes unless the revenues generated by such tax are used exclusively for city, county or other local purposes as opposed to state or federal purposes, and such tax is assessed with respect to the address of the Premises or Shopping Center  (or all other buildings similarly situated) and not to Landlord generally without regard to its ownership of the Premises and/or the Shopping Center.

     1.23.  <u>Term Commencement Date</u>:  The earlier of (i) the date which is one hundred eighty (180) days after Landlord substantially completes "Landlord's Work" pursuant to <u>Exhibit C</u> (or would have substantially completed Landlord's Work had Landlord not been prevented from so doing due to delays caused by Tenant), or (ii) the date on which Tenant first opens for business in the Premises.  With respect to any delays in the completion of Landlord's Work which are caused by Tenant, Landlord shall give notice to Tenant promptly after Landlord determines that there has been such delay (which notice shall describe the delay in reasonable detail); and such notice shall be a condition precedent to Landlord's right to fix the Term Commencement Date with reference to such delay.  Notwithstanding the foregoing, in no

- 8 -

event shall the date described in clause (i) of this Section 1.23 occur until Landlord has completed that portion of the Common Area (including, without limitation, the Parking Area) shown as Landlord's Required Pre-Term Work on Exhibit A attached hereto.  If Tenant shall be delayed in the completion by Tenant of Tenant's fixturing work beyond the 180-day period described in clause (i) above due to a *force majeure* event described in Section 26.5 of this Lease or due to delays caused by Landlord, then such 180-day period shall be extended for the period of such *force majeure* and/or Landlord delays.  With reference to any delays in the completion by Tenant of Tenant's fixturing work which are caused by Landlord, Tenant shall give notice to Landlord promptly after Tenant determines that there has been such delay (which notice shall describe such delay in reasonable detail); and such notice shall be a condition precedent to Tenant's right to extend said 180-day period as a result of such delay.

1.24.  Term Expiration Date:  The last day of the two hundred fortieth (240th) month after the Term Commencement Date (including as the first "month" any partial calendar month at the beginning of the Term); provided, however, if Tenant duly exercises an option to extend the Term pursuant to Section 3.4 below, the Term Expiration Date shall thereupon automatically become the last day of the option term for which such option was exercised (and the Term shall include such option term).

2.  LEASE OF PREMISES; LANDLORD'S RESERVED RIGHTS; GROUND LEASE; TENANT'S RIGHT TO TERMINATE LEASE.

2.1.  Demise of Premises.  On the terms and conditions contained herein, Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord.

2.2.  Landlord's Reserved Rights.  Subject to Tenant's rights as set forth below, Landlord shall have the right to use the side and rear walls of the Premises for the purpose of installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Building in locations which do not materially interfere with Tenant's use of the Premises.

2.3.  Tenant's Use of Building Roof.  Tenant shall have the right to install electrical, mechanical, plumbing and HVAC equipment on the roof of the Building, but only if:  (a) Tenant shall first have obtained Landlord's written approval of the type of equipment, manner of installation of the equipment, and the location on the roof where such equipment is to be installed; (b) Tenant shall have obtained any governmental permits and approvals required with respect to the installation of such equipment; (c) the installation of such equipment does not invalidate or otherwise adversely affect the roof warranty obtained by Landlord following construction of the Building; and (d) the installation of such equipment is made by Tenant in compliance with the applicable requirements of Section 9.4 below.  All such equipment shall, following installation, become a part of the Premises.  Tenant shall at all times keep such equipment enclosed or otherwise

-9-

screened from visibility in a manner approved by Landlord and in a state of good condition and repair and in compliance with all applicable legal requirements.  In the event Tenant damages any portion of the roof of the building (including the roof structure and the roof membrane), Tenant shall immediately at its expense repair such damage.  Tenant shall have reasonable access to the roof to maintain and repair all equipment installed on the roof by Tenant.

2.4.  <u>Determination of Gross Leasable Area of Premises</u>. Not later than thirty (30) days after Landlord substantially completes "Landlord's Work" pursuant to <u>Exhibit C</u>, Landlord and Tenant shall jointly confirm the exact Gross Leasable Area of the Premises (subject to adjustment thereafter under <u>Section 2.6</u> below).

2.5.  <u>Lease Subject to Ground Lease</u>.  This Lease is subject and subordinate to that certain Ground Lease, dated November 23, 1994, as evidenced by a memorandum thereof recorded November 23, 1994, as Instrument No. 94-085990, Official Records of Santa Barbara County, California, as amended by a certain First Amendment to Ground Lease dated November 29, 1997, as evidenced by a certain Memorandum of First Amendment to Ground Lease, recorded December 2, 1997, as Instrument No. 97-73345, Official Records of Santa Barbara County, California(the "Ground Lease") as the same may be hereafter modified from time to time. Tenant acknowledges receipt of a copy of the Ground Lease.  Tenant agrees not to commit or permit any act or omission in or about the Premises or the Shopping Center which would constitute a violation of the Ground Lease.  Landlord agrees not to modify or amend the Ground Lease in any manner which would in any material respect increase the obligations to be performed by Tenant under this Lease or diminish the rights to be enjoyed by Tenant under this Lease.

2.6.  <u>Adjustment of Gross Leasable Area of Premises.</u> The Conditions of Approval (as defined in <u>Section 5.6</u> below) provide that the Shopping Center may contain a maximum of 500,000 square feet of "commercial space." Tenant acknowledges that Landlord intends to build and lease improvements in the Shopping Center containing 500,000 square feet of Gross Leasable Area in order to take full advantage of the "commercial space" allowed under the Conditions of Approval; and that, for purposes of such limitation, the Premises are to contain a maximum of 21,900 square feet of Gross Leasable Area (not including Tenant's proposed mezzanines of approximately 3,500 square feet).  Accordingly, Landlord and Tenant have agreed to submit the plans for the Premises as required to the County of Santa Barbara (the "County") for approval in such manner as will not include the Tenant's proposed mezzanines in the stated "commercial space" square footage of the Premises of approximately 21,900 square feet.  Landlord and Tenant further agree that if either (a) during the process of review of the plans for the Premises, or (b) at any time thereafter prior to completion of the construction by Landlord of the 500,000 square feet of "commercial space" in the Shopping Center which is allowable under the Conditions of Approval, the County requires that the square footage of the area of the mezzanines in the Premises be included as

- 10-

"commercial space" for the purpose of the 500,000 square foot limitation specified in the Conditions of Approval, the square footage of the Gross Leasable Area of the Premises shall thereupon be automatically increased by the square footage of the area of the mezzanines which is so included in the "commercial space" by the County for all purposes of this Lease (and in such event, Landlord and Tenant shall immediately execute an amendment to this Lease specifying the increased Gross Leasable Area of the Premises); provided, however, that for the sole purpose of determining the Fixed Minimum Rent payable by Tenant as provided in <u>Section 4.1</u> below, the effective date of including the area of the mezzanines in the Gross Leasable Area of the Premises shall be the date, if ever, that Landlord completes construction of improvements in the Shopping Center which in the aggregate contain that amount of "commercial space" which equals the difference between (a) the 500,000 square feet of "commercial space" which the Shopping Center may contain under the Conditions of Approval and (b) the square footage of the area of the mezzanines in the Premises which the County requires be included as "commercial space" for the purposes of the 500,000 square foot limitation specified in the Conditions of Approval.   Except as expressly provided in the immediately preceding sentence, the square footage of the area of the mezzanines in the Premises shall not be included for purposes of determining the Gross Leasable Area of the Premises under this Lease.

3.   <u>TERM</u>.

3.1.   <u>Duration; Effective Date</u>.   The term of this Lease (the "Term") shall be that period commencing on the Term Commencement Date and ending on the Term Expiration Date (unless sooner terminated as provided in this Lease).   This Lease, and the terms, covenants and conditions contained herein, shall be effective as of the date hereof.

3.2.   <u>Certificate</u>.   Within thirty (30) days following the Term Commencement Date, Landlord shall execute and deliver to Tenant a certificate setting forth the Term Commencement Date and the Term Expiration Date.   Unless Tenant disputes the accuracy of such certificate by giving notice of such dispute to Landlord within fifteen (15) days after receipt of such certificate from Landlord, such certificate shall be deemed conclusively to be accurate in all respects.

3.3.   <u>Holding Over</u>.   If Tenant should remain in possession of the Premises after the expiration of the Term with the express written consent of Landlord and without executing a new lease, then such holding over shall be deemed a tenancy from month-to-month, subject to all conditions, provisions and obligations of this Lease, except that the Fixed Minimum Rent then in effect shall be increased to an amount equal to one hundred twenty five percent (125%) of such Fixed Minimum Rent.

3.4. <u>Options to Extend</u>.

3.4.1. <u>Grant of Options</u>. Landlord hereby grants to Tenant three (3) separate, successive options to extend the Term of this Lease. Each option shall be for an additional term (each, an "option term") of five (5) years (except that the third option shall be for a term of four (4) years and eleven (11) months) and shall commence upon the expiration of the Term (including the most recent option term resulting from Tenant's previous exercise of an option to extend, if applicable). Each option is expressly conditioned upon Tenant's not being in default under any term or condition of this Lease after the expiration of any applicable cure period granted by this Lease, either at the time an option is exercised or at the time the option term in question would commence. Each option is also expressly conditional on Tenant being open for business with the public and operating in one hundred percent (100%) of the Gross Leasable Area of the Premises at the time an option is exercised and at the time the option term in question would commence.

3.4.2. <u>Manner of Exercise</u>. Tenant may exercise each option only by giving Landlord written notice not more than three hundred sixty (360) days and not less than one hundred eighty (180) days prior to the expiration of the Term of this Lease (including the most recent option term resulting from Tenant's previous exercise of an option to extend, if applicable). If Tenant fails to exercise any such option strictly within the time period specified in the immediately preceding sentence, then such option automatically shall lapse and thereafter Tenant shall have no right to exercise such option.

3.4.3. <u>Terms and Rent</u>. If an option to extend is duly exercised, then the Fixed Minimum Rent for the pertinent option term shall be the pertinent amount specified in <u>Section 4.1</u> below. All other terms and conditions of the Lease, as amended from time to time by the parties in accordance with the provisions of the Lease, shall remain in full force and effect and shall apply during each option term.

3.4.4. <u>Options Personal</u>. Notwithstanding anything to the contrary set forth hereinabove, the options to extend the Term of this Lease set forth above may be exercised only by (a) the Tenant named herein, Metropolitan Theatres Corporation, a California corporation, (b) a person or entity described in clause (iii) of <u>Section 13.7</u> hereof to whom Tenant assigns its leasehold interest hereunder without Landlord's consent as permitted under said <u>Section 13.7</u>, or (c) the buyer of a majority of Tenant's movie theatres in Santa Barbara County to whom Tenant assigns its leasehold interest hereunder with Landlord's consent as required under <u>Section 13.1</u> below; and not by any other assignee of Tenant's interest under this Lease.

4. <u>RENT</u>.

4.1. <u>Fixed Minimum Rent</u>. Commencing on the Term Commencement Date and continuing thereafter for a period of five

- 12 -

(5) consecutive years, Tenant shall pay Landlord "Fixed Minimum Rent" in an amount each year equal to the product of the number of square feet of Gross Leasable Area in the Premises multiplied by Twelve Dollars ($12.00). Commencing with the first day after the expiration of such initial 5-year period and continuing thereafter on the first day after the expiration of the second and each subsequent 5-year period during the Term (including the option terms), Fixed Minimum Rent shall be increased for the 5-year period commencing on such day by ten percent (10%). For example, if the Fixed Minimum Rent payable each year during the first five (5) years of the Term is $276,000.00, the Fixed Minimum Rent payable each year during the second five (5) years of the Term would be $303,600.00 and the Fixed Minimum Rent payable each year during the third five (5) years of the Term would be $333,960.00. Fixed Minimum Rent shall be paid in equal monthly installments, without notice, deduction or offset, in advance on or before the first day of each month during the Term; provided, however, if the Term Commencement Date is not the first day of a calendar month, then Tenant shall pay to Landlord, on the Term Commencement Date, a pro rata portion of the Fixed Minimum Rent for such partial calendar month, prorated based on a 30-day month; and, provided further, that if the Term Expiration Date is not the last day of a calendar month, then Tenant shall pay to Landlord, on the first day of the last month of the Term, a pro rata portion of the Fixed Minimum Rent for such partial calendar month, prorated based on a 30-day month.

4.2.  <u>Percentage Rent</u>. In addition to Fixed Minimum Rent, Tenant shall pay Percentage Rent to Landlord for each Lease Year during the Term, in the manner and at the times hereinafter specified.

4.2.1.  <u>Annual Statements and Payment</u>. Percentage Rent for each Lease Year shall be paid in a single annual installment computed on Tenant's Gross Receipts for each such Lease Year. Within sixty (60) days after each Lease Year, Tenant shall furnish to Landlord a true and accurate statement of the Gross Receipts of Tenant for such Lease Year, showing in detail all items, deductions, exclusions and additions included in the calculation of Gross Receipts for such Lease Year, the amount of Fixed Minimum Rent paid for such Lease Year, and the actual amount of Percentage Rent due for such Lease Year. Such annual statement shall be in such form as Landlord may, from time to time, prescribe and shall be certified as correct by an authorized representative of Tenant. Tenant shall pay with such annual statement the Percentage Rent due from Tenant for such Lease Year.

4.2.2.  <u>Quarterly Statements</u>. In addition to the annual statements of Gross Receipts required of Tenant under <u>Section 4.2.1</u> above, Tenant shall furnish to Landlord within forty five (45) days after the end of each of the first three (3) calendar quarters during each Lease Year during the Term (i.e., within forty five (45) days after each March 31, June 30 and September 30 during the Term) a true and accurate statement of the Gross Receipts of Tenant for the preceding calendar quarter. Each such quarterly statement shall comply in all respects with the

- 13-

requirements for the annual statements of Tenant's Gross Receipts specified in <u>Section 4.2.1</u> above (except that the information to be specified on each quarterly statement shall relate to the current Lease Year only through the end of the preceding calendar quarter rather than to the full Lease Year).

      4.2.3.  <u>Books and Records</u>.  Tenant shall keep and maintain, and shall require each Permittee, if any, to keep and maintain, at the Premises, or at Tenant's principal office, accurate, true and complete books and records and accounts of all Gross Receipts, including books of account or general ledger, daily bank deposits, sales tax reports, and cash register tapes and receipts upon which every sale and other transaction made in, at or from the Premises shall be recorded.  Such books, records and accounts shall be maintained in such manner, and include such records, as would be required by a certified public accountant to perform an audit to determine, or produce an audited statement of, Tenant's Gross Receipts.  Tenant shall, for a period of three (3) years after the end of each Lease Year, keep safe and intact all of such books, records and accounts maintained by Tenant and each Permittee hereunder.

      4.2.4.  <u>Inspection and Audit</u>.  Tenant shall during normal business hours, and upon not less than five (5) business days' prior notice, provide to Landlord, and its authorized representatives, access to the books, records and accounts of Tenant (and each Permittee, if any) required to be maintained under <u>Section 4.2.3</u> above for inspection, review and/or copying. Landlord and its authorized representatives shall also have the right, at any time and from time to time upon not less than five (5) business days' prior notice to audit all of such books, records and accounts maintained by Tenant hereunder.  The rights of Landlord set forth hereinabove in this <u>Section 4.2.4</u> may be exercised only with respect to the books, records and accounts of Tenant for any and all of the three most recent Lease Years. If Tenant at any time causes, makes, or causes to be made an audit of Tenant's business conducted in or upon the Premises, Tenant shall furnish Landlord a copy of such audit, together with a copy of any opinion thereon by the auditing certified public accountant.  If any Landlord's audit hereunder, or any audit supplied by Tenant hereunder, shows that Gross Receipts or Percentage Rent as set forth on Tenant's statement for any Lease Year were understated by more than three percent (3%), or if either such audit shows that Tenant has failed to maintain its books, records and accounts in the manner required by <u>Section 4.2.3</u> so that Landlord is unable to verify the accuracy of Tenant's statements, then Tenant shall pay Landlord the cost of such audit (unless the audit was performed by Tenant).  Tenant shall promptly pay to Landlord upon completion of any audit hereunder any Percentage Rent found due as a result thereof, together with Interest thereon from the date payment was required to be made until the date actually paid hereunder. Nothing contained in this <u>Section 4.2.4</u> shall excuse Tenant from its obligations to maintain accurate and complete books, records and accounts, to report accurately Gross Receipts and the amount of Percentage Rent due, and to pay the Percentage Rent actually due, and the rights and remedies of Landlord hereunder shall be in

addition to, and not in lieu of, any other rights or remedies under this Lease on account of Tenant's failure to comply with its obligations hereunder.  Acceptance by Landlord of any monies paid to Landlord by Tenant as Percentage Rent, as shown by any annual statement furnished by Tenant hereunder, shall not be an admission of the accuracy of such statement or of the amount of such Percentage Rent payment.

4.3.  <u>Additional Rent</u>.  For all purposes under this Lease, all sums and other amounts payable by Tenant to Landlord or otherwise hereunder which are not specifically denominated as "rent" shall be payable as and shall be deemed to be additional rent.  Such sums and amounts shall be payable, without deduction, offset or abatement (except as otherwise provided in this Lease), as and when provided under this Lease, unless no date is specified, in which case such sums shall be payable together with each installment of Fixed Minimum Rent payable hereunder.

4.4.  <u>Late Charge</u>.  Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent and other sums due under this Lease will cause Landlord to incur additional costs not contemplated by this Lease, the exact amount of which will be extremely difficult or impossible to ascertain.  Such additional costs include processing and accounting charges and late charges which may be imposed upon Landlord by the terms of any mortgage or deed of trust covering the Premises.  Therefore, if any installment of Rent or any other sum due from Tenant shall not be received by Landlord within ten (10) days after the date that such amount is due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount, provided that as to the first instance during each calendar year in which payment of any installment of Rent or any other sum due from Tenant hereunder is not received by Landlord within ten (10) days after the date due, no late charge shall be imposed unless Tenant fails to make the late payment within ten (10) days after notice from Landlord that the payment has not been made when due.  The parties hereby acknowledge, warrant and represent that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.  Acceptance of such late charge by Landlord shall in no event constitute a waiver of an Event of Default with respect to such overdue amount or prevent Landlord from exercising any or all of the other rights and remedies granted under this Lease.  Landlord may, as a matter of convenience, provide to Tenant from time to time billings or invoices for Rent or other sums due under this Lease, but Tenant's failure to receive any such billing or invoice, or Landlord's omission or cessation of any such billing or invoice shall not excuse Tenant's obligation for the timely payment of Rent and other sums due in accordance with this Lease.

5.  <u>PERMISSIBLE USE; TENANT'S COVENANT TO OPEN; LANDLORD'S RIGHT TO TERMINATE LEASE; TENANT'S CONDUCT OF BUSINESS</u>.

5.1.  <u>Use</u>.  Tenant shall use the Premises (i) primarily as a first-class motion picture theatre containing not more than 1,090 seats with a maximum of eight auditoriums in each of which

- 15-

Tenant shall present to the public only First Run Films (as defined hereinbelow); (ii) for the incidental retail sale therein of food, beverages, refreshments and other goods, merchandise and services related to the movie industry and the operation of games and other amusement devices (electronic or otherwise) to or by persons admitted to the Premises in connection with the operation of the Premises as a motion picture theatre; and (iii) for the incidental presentation of meetings, telecasts and other audio-visual and public presentations. The number of square feet of Gross Leasable Area in the Premises devoted to the use described in clause (ii) above shall not at any time exceed, in the aggregate, ten percent (10%) of the total Gross Leasable Area in the Premises (not including portions of the theatre lobby not specifically devoted to such uses). For purposes hereof, a First Run Film shall be defined as (a) a motion picture not previously exhibited in the Santa Barbara market other than during a period of not more than five (5) days during the immediately preceding three hundred sixty (360) days, or (b) a motion picture that is re-released for exhibition after its initial release for exhibition to capitalize upon anticipated box office appeal because of new trade association awards (such as Academy Awards) or new major media commendations recognizing the exceptional merit or quality of such motion picture. Notwithstanding the foregoing, (w) Tenant shall be entitled to use one auditorium for the purpose of the presentation of non-First Run Films; (x) Tenant shall be entitled to use one (1) auditorium for the presentation of a motion picture not previously exhibited in the Santa Barbara market other than during a period of not more than seven (7) days during the immediately preceding three hundred sixty days (360) days; (y) Tenant shall be entitled to use one or more of the auditoriums in the Premises prior to 4:00 p.m. Monday through Friday and prior to 2:00 p.m. on Saturdays, Sundays and holidays for the presentation of non-First Run Films; and (z) at any time after the first ten (10) Lease Years, Tenant shall be entitled to use one or more of the auditoriums in the Premises for the presentation of non-First Run Films, but with respect to this clause (z), only on the following conditions: (i) Tenant first obtains Landlord's written approval of such use, which approval shall not be unreasonably withheld if Tenant can demonstrate to Landlord's reasonable satisfaction that such use will increase Gross Receipts for the hours during which such use is permitted; and (ii) Landlord shall have the right to require Tenant to discontinue such use after a period of six (6) months (or after any period of six (6) months thereafter during the Lease Term) if Landlord reasonably concludes that Gross Receipts have not increased during such 6-month period for the hours during which such use is permitted. In no event shall Tenant at any time display films in the Premises which would receive an X-rating under the rating system from time to time used in the motion picture industry (or comparable rating if the "X" designation is at any time discontinued), or which would be classified as "adult entertainment" or "for adults only" or words of similar import or which would violate any local, state or federal law proscribing or prohibiting what is commonly known as pornography or obscenity. For purposes of <u>Section 4.2</u> of the Declaration, Landlord hereby represents and warrants to Tenant that Tenant shall not be in violation of that provision of <u>Section 4.2(b)</u> of the Declaration

- 16-

prohibiting the exhibition of pornographic or obscene materials if and to the extent Tenant operates in compliance with the restrictions specified in the immediately preceding sentence. Landlord hereby represents and warrants to Tenant that Tenant's use of the Premises as permitted hereinabove in this <u>Section 5.1</u> is permitted under the Conditions of Approval (as defined in <u>Section 5.6</u> below).  Tenant shall store in the Premises only such goods and merchandise which Tenant intends to sell at, in or from the Premises within a reasonable time after receipt thereof.  Tenant shall not use or permit the Premises to be used for any other purpose without the prior written consent of Landlord, which consent shall not be unreasonably withheld.  In this regard Tenant agrees that Landlord shall be acting reasonably in withholding consent to any proposed change in use if Landlord reasonably determines that the changed use will: (i) conflict with or duplicate the principal use of any other tenant or occupant of the Shopping Center; (ii) violate any exclusive use agreement between Landlord and any other tenant or occupant of the Shopping Center; (iii) be incompatible with the existing tenant mix or the retail/commercial character of the Shopping Center; (iv) increase the premiums for any insurance required to be carried or carried by Landlord on the Premises, or the Shopping Center, unless Tenant agrees to be responsible for such increase; (v) require any alteration, addition or improvement to be made by Landlord to the Premises, or the Shopping Center (or to the mechanical, plumbing or electrical systems thereof), unless Tenant agrees to pay for such alteration, addition or improvement; (vi) result in any increase in expenses to be incurred by Landlord in the operation, management, maintenance or repair of the Premises, or the Shopping Center, unless Tenant agrees to be responsible for such increase; (vii) result in any increase in the use of the Parking Areas which would adversely affect the parking available in the Parking Area to other tenants and occupants of the Shopping Center; or (viii) violate any applicable law, ordinance, rule, regulation or order.  Tenant agrees that the foregoing list of grounds upon which Landlord may reasonably withhold consent to a proposed change of use is not intended to be exclusive or to preclude Landlord from relying on other grounds which may be reasonable at the time in withholding consent to a proposed change of use.

     5.2.  <u>Tenant's Opening Covenant</u>.  Tenant agrees to open the Premises for business to the public in one hundred percent (100%) of the Gross Leasable Area of the Premises as a motion picture theatre as required in <u>Section 5.1</u> above on or before the date which is ninety (90) calendar days after Landlord substantially completes "Landlord's Work" pursuant to <u>Exhibit C</u> (or would have substantially completed Landlord's Work had Landlord not been prevented from so doing due to delays caused by Tenant); and Tenant shall remain open and operating in compliance with the requirements specified hereinabove in this <u>Section 5.2</u> for at least one (1) day.  Notwithstanding the foregoing, in no event shall Tenant be required to open the Premises for business as required under this <u>Section 5.2</u> until Landlord has completed that portion of the Common Area (including, without limitation, the Parking Area) shown as Landlord's Required Pre-Term Work on <u>Exhibit A</u> attached hereto.  If Tenant shall be delayed in the completion by Tenant of

- 17-

Tenant's fixturing work beyond the 90-day period described hereinabove in this <u>Section 5.2</u> due to a *force majeure* event described in <u>Section 26.5</u> of this Lease or due to delays caused by Landlord, then such 90-day period shall be extended for the period of such *force majeure* and/or Landlord delays.

5.3. <u>Landlord's Right to Terminate Lease on Tenant's Cessation of Operations</u>. Subject to <u>Section 5.2</u> above, Tenant shall have the right at any time to cease operating its business in the Premises; provided, however, that if at any time Tenant ceases to operate in less than a substantial portion of the Gross Leasable Area of the Premises other than a temporary closure due to (a) the restoration or reconstruction of the Premises following a casualty or a taking under the power of eminent domain (which shall not exceed two hundred seventy (270) days) (b) or the repair, alteration or remodeling of the Premises (which shall not exceed ninety (90) days), provided that in either instance such work is being prosecuted to completion with all due diligence and continuity (any such temporary closure being hereinafter referred to as a "Permitted Temporary Closure"), and such cessation continues for a period of six (6) consecutive months, Landlord shall have the right to terminate this Lease by giving at least thirty (30) days' prior notice of termination to Tenant at any time prior to the recommencement by Tenant of operations in a substantial portion of the Gross Leasable Area of the Premises. For purposes hereof, the term "a substantial portion of the Gross Leasable Area of the Premises" shall mean at least four (4) of the auditoriums in the Premises.

5.4. <u>Compliance With Laws</u>. Tenant shall promptly comply with any and all present and future laws, ordinances, rules, regulations and orders applicable to the Premises, whether foreseen or unforeseen, including all laws relating to health and safety and disabled accessibility including, without limitation, the Americans With Disabilities Act, 42 U.S.C. Sections 12101, <u>et seq</u>. and Title 24 of the California Code of Regulations, all present and future Environmental Laws, and all present and future life safety, fire sprinkler, seismic retrofit and other building code requirements. Tenant's obligations hereunder shall include the making of alterations, additions and improvements, both structural and non-structural, and the installation of all additional facilities and equipment required by reason of Tenant's particular use of the Premises or Tenant's alteration of the Premises, regardless of, among other factors, the relationship of the cost of the required action to the Fixed Minimum Rent payable under this Lease, the length of the then remaining Term hereof, the relative benefit of the repairs to Tenant or Landlord, the degree to which the curative action may interfere with Tenant's use or enjoyment of the Premises, and the likelihood that the parties contemplated the particular law involved. Tenant shall not use, or permit the use of, any portion of the Premises for any unlawful purpose. Tenant may contest or review, by procedures permitted by applicable law, at its own expense, any such order, requirement, law, ordinance, rule or regulation, and may delay compliance therewith if permitted by such law, provided that Landlord or any other tenant, occupant or owner of the Shopping Center is not subject to civil liability

- 18 -

or criminal prosecution as a result thereof and Landlord's title to
or interest in, or such tenant's, occupant's or owner's business in
or title to, the Shopping Center, or any portion thereof, is not
subjected to forfeiture, involuntary sale, loss or closure as a
result thereof. Tenant shall indemnify, defend, protect and hold
Landlord and such other tenants, occupants and owners harmless from
and against any and all liability, loss, cost, damage or expense
(including attorneys' fees) resulting from or in connection with
any contest hereunder. Any contest shall be conducted with all due
diligence. Tenant shall diligently comply with any final,
non-appealable decision in any such contest.

     5.5. <u>Use Limitations and Requirements</u>. Tenant shall not
conduct or allow any auction, fire, going out of business, or
bankruptcy sales in or from the Premises. Tenant shall not use or
permit the use of the Premises in any manner which is not
appropriate for first-class shopping centers in the Santa Barbara
area conducted in accordance with good and generally accepted
standards of operation or which would constitute a nuisance or
disturb the quiet enjoyment of the other tenants of the Shopping
Center. Tenant shall not load or unload merchandise, supplies or
other property in or from any area in the Shopping Center except
the area specifically designated therefor from time to time by
Landlord; Tenant shall not permit vehicles or equipment engaged in
loading or unloading to park or stand outside of such designated
area in any manner which may interfere with the use of the Shopping
Center Common Area; and Tenant shall use its best efforts to
complete or cause to be completed all deliveries, loading,
unloading and services to the Premises prior to 10:00 a.m. each
day. Tenant shall not use or permit the use of the Shopping Center
Common Area or the public sidewalks or streets adjacent to the
Premises or any other space outside the Premises for the display,
sale or offering of any merchandise or services or for any other
business or undertaking. Tenant shall, at its sole cost and
expense, comply with any and all orders and requirements imposed by
any insurance carrier providing casualty (including fire and
extended coverage) or public liability insurance to Tenant or
Landlord and covering the Premises or the Shopping Center or any
portion thereof. Tenant shall keep all mechanical apparatus in or
about the Premises free of vibration and noise which may be
transmitted beyond the confines of the Premises; and Tenant shall
provide visual and sound barriers approved by Landlord for Tenant's
rooftop equipment, systems and fixtures (including HVAC), if any.
Tenant shall provide, or cause to be provided, all security in the
Premises deemed to be necessary or desirable by Tenant. Tenant
shall keep the Premises, front and rear walkways adjacent to the
Premises, and any service delivery facilities allocated for the use
of Tenant (whether or not exclusive) clean and free from rubbish
and dirt at all times, shall store all trash and garbage within the
Premises, and shall arrange for the regular pickup of such trash
and garbage at Tenant's expense, unless garbage pick-up is included
in Common Area Maintenance Costs pursuant to <u>Section 12.2</u>. Tenant
shall not burn any trash or garbage of any kind in or about the
Premises or Shopping Center. All plumbing facilities within or
serving the Premises shall be used only for the purposes for which
they are installed, and no foreign substance of any kind shall be

- 19-

thrown therein; any and all costs and expenses resulting from misuse of such plumbing facilities in violation of the foregoing by Tenant or any other person shall be borne by Tenant.

5.6. <u>Compliance With Conditions of Approval</u>. Attached hereto as <u>Exhibit D</u> and incorporated into this Lease by reference are certain conditions which were imposed by the County of Santa Barbara (the "County") upon certain of the entitlements obtained by Landlord for the development of the Shopping Center (the "Conditions of Approval"): (a) the Conditions of Approval imposed by the County in connection with its approval of Landlord's Final Development Plan (95-DP-026) for the development of the Shopping Center (referred to therein as the "Marketplace") and other improvements in adjacent areas under the control of Landlord; and (b) the Conditions of Approval imposed by the County in connection with approval of Landlord's Conditional Use Permit (95-CP-062) for a motion picture theatre in the Shopping Center (as modified by that certain letter, dated August 26, 1998 from the County confirming that the Premises may contain up to 21,900 square feet of "commercial space"). Among other matters, the Conditions of Approval impose certain constraints on the design, construction, use and operation of the Premises, the Shopping Center generally and certain adjacent areas. Tenant agrees to comply with all provisions of the Conditions of Approval which are applicable to the use and/or operation of the Premises, along with those which are applicable to the design and construction of those portions of the Premises to be constructed by Tenant. Landlord hereby agrees to comply with all provisions of the Conditions of Approval which are applicable to the design, construction, use or operation of the Building (other than the Premises) and/or the Shopping Center, along with those which are applicable to the design and construction of those portions of the Premises to be constructed by Landlord. Landlord hereby agrees that Landlord will not claim that Tenant is in violation of the Conditions of Approval unless and until the County gives notice to Landlord or Tenant of such violation. Landlord further agrees to cooperate as Tenant may reasonably request in assisting Tenant to obtain assurances reasonably satisfactory to Tenant from the County that Tenant's contemplated operation of its motion picture theatre in the Premises until 1:00 a.m. on Saturday and Sunday mornings will not constitute a violation of the Conditions of Approval. Landlord further agrees that Landlord will not claim that Tenant is in violation of the Conditions of Approval in exceeding the permissible maximum of 21,900 square feet of "commercial space" if the County at any time requires that all or any portion of the mezzanines in the Premises be included as "commercial space" for the purpose of the 500,000 limitation on "commercial space" in the Shopping Center specified in the Conditions of Approval.

5.7. <u>Compliance with Declaration</u>. Tenant acknowledges that the Shopping Center and the Premises, and Tenant's use thereof, are subject to that certain Declaration of Covenants, Conditions and Restrictions, dated as of June 26, 1996, and recorded in the Official Records of Santa Barbara County, California, on July 3, 1996 as Instrument No. 96-040577, as amended by a certain First Amendment to Declaration of Covenants,

-20-

Conditions and Restrictions, dated as of December 2, 1997, and recorded in the Official Records of Santa Barbara County, California on December 2, 1997, as Instrument No. 97-073344 (the "Declarations"). Tenant acknowledges receipt of a copy of the Declaration. Tenant agrees not to commit or permit any act or omission in or about the Premises or Shopping Center which would constitute a violation of the Declaration, including, without limitation, the use restrictions which are set forth in <u>Section 4.2</u> of the Declaration. Landlord agrees not to modify or amend the Declaration in a manner which would in any material respect increase the obligations to be performed by Tenant under this Lease or diminish the rights to be enjoyed by Tenant under this Lease.

5.8. <u>Tenant's Exclusive</u>. Notwithstanding any contrary provision of this Lease, during the Lease Term, Landlord shall not cause or permit any Gross Leasable Area in the Shopping Center, other than the Premises and the Excluded Premises (as defined hereinbelow), to be leased, occupied or used (a) for the operation of a motion picture theatre, or (b) for the display of motion pictures except for the television display of videocassettes or the like as an incident to an unrelated primary use of another occupant of the Shopping Center (for example, the display of children's videos as an incident to the operation of a childcare facility); provided, however, that the foregoing restriction shall automatically become null and void and of no further force or effect if (x) at any time the primary use of the Premises is other than a motion picture theatre showing First Run Films as and to the extent required under <u>Section 5.1</u> above, (y) at any time Tenant ceases to operate its business in the Premises for a period of ninety (90) consecutive days (not including any Permitted Temporary Closure as defined in <u>Section 5.3</u> above), or (z) an Event of Default of the type specified in <u>Section 1.5(b)</u> above occurs which Tenant does not cure within the applicable time period specified in <u>Section 19.1</u> below and thereafter Landlord gives Tenant a further written notice specifying such Event of Default and Tenant fails to cure such Event of Default within a period of thirty (30) days following receipt of such notice. For purposes of this <u>Section 5.8</u>, the term "Excluded Premises" shall mean and refer to (i) those certain premises in the Shopping Center which have been demised by Landlord to Home Depot U.S.A., Inc., a Delaware corporation, under a certain Lease Agreement dated as of July 8, 1996, as amended (the "Home Depot Lease"); and(ii) those certain premises in the Shopping Center which have been demised by Landlord to Costco Wholesale Corporation, a Washington corporation, under a certain Lease, dated as of July 1, 1996, as amended. For as long as Tenant's exclusive set forth above in this <u>Section 5.8</u> remains in effect, Landlord agrees not to enter into any amendment of the Home Depot Lease which would permit the tenant thereunder to use or occupy the premises demised thereunder (a) for the operation of a motion picture theatre, or (b) for the display of motion pictures except for the television display of video cassettes or the like as an incident to an unrelated primary use by such tenant of such premises.

5.9 <u>Tenant's Covenant Re: Stadium Seating in Other Tenant Theatres</u>. For a period of one (1) year from and after the

date Tenant first opens the motion picture theatre in the Premises for business with the public, or if Landlord does not complete Landlord's Work within twelve (12) months after the date of this Lease, then for a period of one (1) year from and after the date Tenant would have opened for business if Landlord had completed Landlord's Work within such twelve (12) month period (either such period being hereinafter referred to as the "Restricted Period"), Tenant shall not install in any existing motion picture theatre (each such motion picture theatre being hereinafter referred to as a "Tenant's Other Theatre") in the Relevant Market Area (as defined hereinbelow) which is owned or operated directly or indirectly by Tenant (but not including any new theatre hereafter constructed by Tenant) stadium seating in more than two (2) auditoriums; PROVIDED, HOWEVER, that the foregoing restriction shall automatically lapse and terminate in the event that any theatre operator or owner not affiliated with Tenant enters into a binding lease or agreement with its Landlord or obtains a final discretionary approval from the City or County of Santa Barbara for the installation of stadium seating in a motion picture theatre in the Relevant Market Area. For purposes hereof, the term "Relevant Market Area" shall be defined as Southern Santa Barbara County, extending from the City of Carpinteria to the South and the unincorporated area of Goleta to the North.   In the event Tenant breaches its obligations specified hereinabove in this Section 5.9, then, in addition to all other rights and remedies which Landlord may have as a result of such breach under this Lease or applicable law, Landlord shall have the right to require that the Gross Receipts which are received by Tenant or any Permittee of Tenant from the operation of each such Tenant's Other Theatre in which stadium seating has been installed in more than two (2) auditoriums therein from and after the date of such breach and continuing for the remainder of the Restricted Period shall be deemed to be and shall be included within Gross Receipts from the Premises for purposes of Percentage Rent. Landlord may exercise such right at any time after such breach by giving notice of exercise to Tenant.   In the event Landlord exercises such right, Landlord shall have the rights and Tenant shall have the obligations which are specified in Section 4.2 of this Lease with respect to the Gross Receipts from each such Tenant's Other Theatre.

6.   INSURANCE.

6.1.   Tenant's Insurance.  At its sole cost and expense, Tenant shall maintain in full force and effect during the Term the following policies of insurance:

6.1.1.   Liability Insurance.   Commercial General Liability Insurance, insuring against liability for bodily injury or death to persons, property damage and personal injury, covering the Premises and the business of Tenant, with a comprehensive single limit of liability not less than $3,000,000.00, such coverage to be in a commercial general liability form with at least the following endorsements:  (i) deleting any employee exclusion on personal injury coverage; (ii) including coverage for injuries to or caused by employees; (iii) providing for blanket contractual liability coverage (including Tenant's indemnity obligations

- 22 -

contained in this Lease), broad form property damage coverage and products completed operations, owner's protective and personal injury coverage; (iv) providing for coverage of employers automobile non-ownership liability; and (v) if liquor is served in the Premises, providing liquor liability coverage. All such insurance: (i) shall be primary and non-contributory; (ii) shall provide for severability of interests; (iii) shall provide that an act or omission of one of the named insureds shall not reduce or avoid coverage to the other named insureds; and (iv) shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period. If the amount or scope of such coverage is inadequate at any time during the Term on comparison with the amount or scope of coverage under insurance carried by the owners or operators of comparable first class motion picture theatres in the Southern California area, at Landlord's request Tenant shall increase the amount or scope of such coverage accordingly.

6.1.2. <u>Workers Compensation Insurance</u>. Workers Compensation Insurance in the manner and to the extent required by applicable law and with limits of liability not less than the minimum required under applicable law, covering all employees of Tenant having any duties or responsibilities in or about the Premises. Tenant's Workers Compensation Insurance shall include an employer's contingent liability endorsement.

6.1.3. <u>Tenant's Property Insurance</u>. A policy of standard fire and extended coverage insurance with vandalism and malicious mischief endorsements (and including, by endorsement or otherwise, coverage for sprinkler leakages and plate glass), together with such additional coverages as Tenant may deem desirable or necessary, covering all personal property (including Tenant's trade fixtures and equipment), Tenant's alterations (whether completed by Tenant or Landlord or paid for by Tenant or Landlord), including alterations to Tenant's storefront, in, on or about the Premises, to the extent of at least eighty percent (80%) of their full replacement value. The proceeds from any such policy shall be used by Tenant for the replacement of Tenant's personal property, or the restoration of Tenant's improvements or alterations (with any balance or excess being payable to Landlord and Tenant as their interests may appear).

6.2. <u>Landlord's Insurance</u>. Landlord shall maintain in full force and effect during the Term the following insurance coverages:

6.2.1. <u>Property Insurance</u>. A policy or policies of fire insurance covering the Building and/or other buildings within the Shopping Center, with standard extended coverage, vandalism, malicious mischief and sprinkler leakage endorsements, loss of rent insurance (also known as rent continuation insurance), and earthquake and/or flood coverage if available at commercially reasonable premiums or required by Landlord's lender, and such other insurance in such amounts and covering such other perils or hazards deemed appropriate by Landlord. The amount and scope of

- 23-

coverage of Landlord's insurance hereunder shall be determined by Landlord from time to time in its sole discretion and shall be subject to such deductible amounts as Landlord may elect, provided that Landlord's insurance shall be not less than that carried by other prudent landlords of comparable shopping centers in the Southern California area. Landlord shall have the right to reduce or terminate any insurance or coverage called for by this Section 6.2.1 to the extent that any such coverage is not reasonably available in the commercial insurance industry from recognized carriers or not available at a cost which is in Landlord's judgment commercially reasonable under the circumstances. The cost of all insurance maintained by Landlord hereunder, or otherwise on all or any portion of the Shopping Center, may be included in Common Area Maintenance Costs as provided in Section 1.3. All insurance proceeds payable under Landlord's casualty insurance carried hereunder shall be payable solely to Landlord, and Tenant shall have no interest therein.

6.2.2. Liability Insurance. A policy or policies of Commercial General Liability Insurance covering the Common Area of the Shopping Center, insuring against all liability for bodily injury or death to persons, property damage and personal injury, with a comprehensive single limit of liability of not less than Five Million Dollars ($5,000,000.00) or such other higher amount as Landlord may reasonably deem prudent at the time. Landlord may also carry such additional insurance coverages for the Common Area as Landlord deems reasonably prudent from time to time. Landlord shall pay the premiums for all such insurance (but the premiums may be included by Landlord in Common Area Maintenance Costs as provided in Section 1.3).

6.3. Policy Requirements. All insurance policies required to be carried under this Lease shall be issued by financially sound insurers which are licensed to do business in the State of California. All Tenant's insurance (other than Worker's Compensation and personal property insurance) shall name Landlord, and such other persons or entities as Landlord may from time to time designate, as additional insureds or loss payees, as appropriate. On or before the Term Commencement Date, Tenant shall deliver to Landlord certificates of all insurance required to be carried by Tenant hereunder, showing that such policies are in full force and effect in accordance with this Article 6 (and Tenant shall deliver such certificate to Landlord showing the renewal or replacement of each policy of insurance not later than twenty (20) days prior to the expiration of each such policy). Tenant shall obtain and deliver to Landlord on or before the Term Commencement Date and thereafter within ten (10) days following the renewal or replacement of each insurance policy written undertakings from each insurer under policies maintained by Tenant hereunder to notify Landlord, and any other additional insured or loss payee thereunder, at least thirty (30) days prior to cancellation, amendment or reduction in coverage under any such policy.

6.4. Blanket Coverage. Any policy required to be maintained hereunder by either party may be maintained under a so-called "blanket policy", insuring other parties and other

- 24-

locations, so long as the amount of insurance required to be provided hereunder is not thereby diminished.

6.5. <u>Waiver of Subrogation</u>. To the extent permitted by law, Landlord and Tenant each waive any right to recover against the other on account of any and all claims Landlord or Tenant may have against the other with respect to any risk insured against by insurance actually carried, or required to be carried hereunder. Each casualty insurance policy carried by Landlord or Tenant hereunder, or which either may obtain with respect to the Premises or the Shopping Center independent of obligations hereunder, shall provide that the insurer waives all rights of recovery by way of subrogation against Landlord or Tenant in connection with all matters included within the scope of the waiver of recovery contained in this <u>Section 6.5</u>.

7. <u>TAXES</u>.

7.1. <u>Tenant's Payment of Common Taxes</u>. Commencing on the Term Commencement Date and thereafter throughout the Term, Tenant shall pay to Landlord, as part of Common Area Maintenance Costs, Tenant's Proportionate Share of Taxes as additional rent. Notwithstanding the foregoing, if the Premises are separately assessed, Tenant shall pay to Landlord all Taxes levied or assessed against the Premises, in which event the Taxes to be included in Common Area Maintenance Costs shall not include any Taxes levied or assessed against the buildings of the individual occupants of the Shopping Center); each such payment shall be made to Landlord not later than thirty (30) days prior to the date that the Taxes to be paid would become delinquent if not paid and Landlord shall give a written request for each such payment to Tenant which shall be accompanied by a copy of the pertinent tax bill not later than sixty (60) days prior to the delinquency date.

7.2. <u>Tenant's Payment of Taxes Relating to Premises</u>. In addition to payment by Tenant of its Proportionate Share of Taxes, Tenant shall pay any and all taxes, assessments, license fees, business taxes, impositions, excises or charges, of any kind or character, general or special, ordinary or extraordinary, unforeseen as well as foreseen, which are: (i) levied against, upon, measured by or attributable to any and all fixtures, equipment and personal property installed or located in the Premises, or levied upon, measured by or reasonably attributable to the cost or value of any of the foregoing; (ii) levied upon or measured by the Fixed Minimum Rent, Percentage Rent or any other amounts payable by Tenant hereunder; (iii) levied upon or with respect to the transaction under this Lease, any document to which Tenant is a party creating or transferring any interest or an estate in the Premises, or any leases, subleases, licenses or concessions made by Tenant, any subtenant or other occupant of the Premises; or (iv) enacted by way of substitution for or in addition to all or any of the foregoing. Tenant shall make payment of all amounts hereunder before delinquency directly to the levying authority and shall provide Landlord receipts evidencing such payments. If any of the foregoing taxes, assessments, fees or charges are included in tax bills to Landlord for Taxes, then

-25-

Tenant shall pay to Landlord the amount attributable to the taxes, fees, assessments or charges so included immediately upon demand by Landlord and prior to the payment date required with respect to such tax bill.

8.    CONSTRUCTION.

        8.1.    Initial Construction.  The design and construction of the Premises, and "Landlord's Work" and "Tenant's Work" therein, shall be undertaken in accordance with the provisions of Exhibit C.

        8.2.    Acceptance of Premises.  The opening by Tenant of its business in the Premises shall constitute acknowledgment by Tenant that the Premises are then in the condition called for by this Lease and that Landlord has performed all of Landlord's Work with respect thereto (subject to (a) the completion or correction by Landlord of any remaining punch-list items and (b) the repair by Landlord of any latent defects in workmanship or materials in the improvements constructed or installed by Landlord as part of Landlord's Work pursuant to Exhibit C hereto which are specified in a notice given by Tenant to Landlord within one (1) year after the date upon which Landlord gives notice to Tenant that Landlord has substantially completed Landlord's Work).

9.    REPAIRS AND MAINTENANCE; ALTERATIONS.

        9.1.    By Landlord.  Subject to damage or destruction or condemnation governed by Articles 15 and 16, respectively, Landlord shall keep in good order, condition and repair, foundations, roof structure (but not including the roof membrane), structural portions of the walls and the exterior surfaces of the exterior walls, and the downspouts and gutters of the Building and other Shopping Center buildings (excluding therefrom all windows, doors, plate glass, show cases and storefronts), reasonable wear and tear and any damage caused by any act or omission of Tenant or its employees, agents, invitees, licensees, contractors or subtenants excepted.  Such maintenance and repair of the structural portions of the walls and foundations of the Building and other Shopping Center buildings shall be at Landlord's sole cost and expense; the costs and expenses incurred by Landlord in discharging the other maintenance and repair responsibilities described above shall be included in Common Area Maintenance Costs.  Landlord shall have no obligation to make any repairs or replacements hereunder until the expiration of ten (10) days following written notice from Tenant to Landlord of the need therefor; provided, however, if, because of Landlord's failure to make any necessary repairs or replacements, Tenant is unable to operate its business in the Premises for a period of five (5) consecutive days or more, Tenant shall be entitled to an equitable abatement of rent commencing on the first day after such 5-day period and continuing until Landlord completes the necessary repairs or replacements.

        9.2.    By Tenant.  Except for those portions of the Premises and the Building for which Landlord is responsible under Section 9.1, and subject to damage or destruction or condemnation governed by Articles 15 and 16, respectively, Tenant, at Tenant's

- 26 -

sole cost and expense, shall at all times keep all portions of the Premises in good order, condition and repair (including replacements, as and when necessary), including, without limitation, all plate glass, show cases, storefront parts and moldings, doors, door jams, door closers, door hardware, fixtures, equipment and appurtenances thereof, floors, partitions, all electrical, lighting, heating, plumbing and sprinkler systems, fixtures and equipment, and any air-conditioning system serving the Premises.   Subject to damage or destruction or condemnation governed by Articles 15 and 16, Tenant shall also be responsible at its cost for keeping and maintaining the roof membrane of the roof of the Building in good condition and repair, which obligation shall include the obligation to make all necessary repairs to eliminate leaks around ducts, pipes, vents or other parts of the air conditioning, heating or plumbing systems which protrude through the roof or floor except to the extent caused by defects in work required to have been performed by Landlord pursuant to Exhibit C.

    9.3.   Alterations by Tenant.   Tenant shall not paint, decorate or change the architectural treatment of any part of the exterior of the Premises or any part of the interior of the Premises visible from the exterior without the prior written consent of Landlord (such consent not to be unreasonably withheld). Tenant shall make no alterations, improvements or additions which would in any way affect the structure, any structural element or the floor slab or roof of the Premises or the Building or the mechanical, electrical or utility systems of the Premises or the Building, without the prior written consent of Landlord (such consent not to be unreasonably withheld). Unless otherwise specified by Landlord pursuant to Section 22.1, all alterations, additions or improvements, to the Premises, including air conditioning and heating equipment, mechanical systems, floor coverings, and fixtures, other than Tenant's trade fixtures, which may be made or installed by Tenant in, upon or about the Premises shall be the property of Landlord, and at the termination of this Lease shall remain upon and be surrendered with the Premises.

    9.4.   Construction Requirements.   Any and all alterations, additions or improvements which require Landlord's consent (and any change in the architectural treatment of any part of the exterior of the Premises) as provided in Section 9.3 above shall be designed by a competent licensed architect or structural engineer and shall be made for Tenant at its cost under the supervision of such architect or engineer by financially sound, bondable contractors of good reputation in accordance with plans and specifications approved in writing by Landlord hereunder before commencement of any work; provided, however, any work on the roof of the Premises which entails penetration of the roof membrane, including, without limitation, the mounting of rooftop HVAC or other equipment, whether undertaken as a part of Tenant's Work or a subsequent alteration, shall be performed by or at the reasonable direction of Landlord's roofing contractor or consultant and the cost thereof shall be borne by Tenant; and, provided further, any saw cutting or coring into the floor slab of the Premises, whether undertaken as a part of Tenant's Work or a subsequent alteration,

- 27-

shall be performed by or at the reasonable direction of Landlord's contractor or consultant and the costs thereof shall be borne by Tenant. Landlord may require in connection with its consent to any alterations, additions or improvements that any contractor, or major subcontractors, provide payment and completion bonds in such amounts and with sureties acceptable to Landlord (but only if such requirement is commercially reasonable given the cost of the alteration and Tenant's ability to provide reasonable assurance of payment of such cost as shown on Tenant's then- current financial statements or other reasonable evidence). All alterations, additions, improvements and repairs made by Tenant shall be performed in a good and workmanlike manner, diligently prosecuted to completion, and using new materials; and all such work shall be performed strictly in compliance with all applicable legal requirements and, if applicable, in accordance with the plans and specifications approved by Landlord. Tenant shall notify Landlord at least twenty (20) days prior to commencement of any alteration, addition or improvement or any repair costing in excess of Ten Thousand Dollars ($10,000) so that Landlord may post, file and/or record any notice of nonresponsibility or other notice required under applicable mechanic's lien laws. Upon completion of any alteration, addition, improvement or repair, Tenant shall deliver to Landlord any certificate of occupancy or other equivalent evidence of completion of such work in accordance with the requirements of applicable law. Upon completion of any alteration, addition, improvement or repair made for Tenant by a third-party contractor, Tenant shall record in the Office of the County Recorder of Santa Barbara County a notice of completion as permitted by California Mechanics Lien Law to commence the running of, or terminate, any period for the filing of liens or claims. Tenant shall perform or cause performance of all work hereunder in accordance with such rules and regulations as Landlord may from time to time prescribe with respect thereto, and in such manner so as not to obstruct or interfere with access to the Premises of any other tenant of the Building or any other building in the Shopping Center, the business of any such tenant conducted therein, or any portion of the Common Area. Prior to commencing any alteration, addition, improvement or repair made for Tenant by a third-party contractor, Tenant shall supply to Landlord evidence that its contractor or contractors have procured such insurance as Landlord may prescribe in connection with such work. Upon completion of any alteration, addition or improvement requiring Landlord's consent as provided above, Tenant shall provide Landlord with "as built" drawings reflecting the completed condition of such work.

9.5. <u>Mechanics' Liens</u>. Tenant shall pay, or cause to be paid, all sums, costs and expenses due for, or purporting to be due for, any work, labor, services, materials, supplies or equipment furnished, or claimed to be furnished, to or for Tenant in, upon or about the Premises, and shall keep the Premises and the Shopping Center free of all mechanic's, materialmen's or other liens arising therefrom. Tenant may contest any such lien, if Tenant first procures and posts, records and/or files a bond or bonds issued by a financially sound, qualified corporate surety, in conformance with the requirements of applicable law for the release of such lien from the Premises and/or Shopping Center. Tenant shall pay

- 28-

and fully discharge any contested claim of lien within five (5) days after entry of final judgment adverse to Tenant in any action to enforce or foreclose the same; notwithstanding any such contest, Landlord shall have the absolute right at any time to pay any lien imposed hereunder if in Landlord's reasonable good faith judgment such payment is necessary to avoid the forfeiture, involuntary sale or loss of any interest of Landlord or any other tenant or owner in the Shopping Center, or any portion thereof. Tenant shall indemnify, defend, protect and hold Landlord harmless of and from any and all loss, cost, liability, damage, injury or expense (including attorneys' fees) arising out of or in connection with claims or liens for work, labor, services, materials, supplies or equipment furnished or claimed to be furnished to or for Tenant in, upon or about the Premises or the Shopping Center.

        9.6.  <u>Waivers</u>.  Tenant hereby waives its rights under California Civil Code Sections 1941 and 1942; and Tenant agrees that the rights and obligations of the parties with respect to repair and maintenance of the Premises are set forth hereinabove in this <u>Article 9</u> (and in <u>Section 19.8.1</u> below).

        10.  <u>UTILITIES</u>.  Tenant shall promptly pay, as the same become due and payable, all bills, charges, fees, assessments and exactions for all water, gas, electricity, heat, refuse pickup, sewer service, telephone, and any other utilities, materials and services furnished to or used by Tenant in, on or about the Premises.  Without limiting the generality of the foregoing, if Landlord elects to supply water to the Premises, Tenant agrees to purchase and pay for same from Landlord at the same rate that the local water utility provider would have charged Tenant for such service had Tenant contracted directly for such service with such provider (such payment to be made from time to time within thirty (30) days of receipt by Tenant of written demand therefor accompanied by reasonable substantiation).  If any utility, material or service is not separately charged or metered to the Premises, Tenant shall pay to Landlord, within thirty (30) days after written demand therefor, Tenant's pro rata share of the total cost thereof; if any utility, material or service is included as part of the maintenance of the Common Area under <u>Article 12</u>, then the cost thereof shall be included in Common Area Maintenance Costs and Tenant shall pay its share thereof in accordance with <u>Section 12.2</u>.  Landlord shall not be liable to Tenant in damages or otherwise if any utilities or services, whether or not furnished by Landlord hereunder, are interrupted or terminated for any reason other than the negligence or willful misconduct of Landlord, nor shall any such interruption or termination relieve Tenant of any of its obligations under this Lease or constitute a constructive eviction.  Notwithstanding the foregoing, Tenant shall be entitled to an equitable abatement of rent for any period during which Tenant is unable to operate its business in the Premises because of a failure or interruption in water or electricity service to the Premises which continues for more than forty-eight (48) consecutive hours and which results from the negligence or willful misconduct of Landlord or its employees, agents or contractors.

11.  <u>ADVERTISING, SIGNS AND DISPLAYS</u>.

11.1.  <u>Premises Signs and Other Advertising Media</u>.
Tenant shall have the right to install its standard identification
sign on the exterior of the front of the Premises provided that (a)
the size and location of such sign has been approved by Landlord in
writing (such approval not to be withheld if the size and location
of such sign is substantially the same as Tenant's building sign at
its other locations in Santa Barbara County as of the date hereof
and not to be otherwise unreasonably withheld), and  (b) such sign
otherwise complies with the applicable requirements of Landlord's
Sign Criteria as approved by the County of Santa Barbara.   In
addition, Tenant shall have the right to install an identification
sign on the exterior of the back wall of the Premises near the top
of such wall provided that such sign complies with the applicable
requirements of Landlord's Sign Criteria as approved by the County
of Santa Barbara.   Tenant shall not affix or install any other
signs or other advertising media (all such signs and other
advertising media, together with Tenant's standard identification
signs placed on the exterior of the Building, being collectively
hereinafter referred to as "signs") (i) on the exterior of the
Premises without Landlord's prior written consent (such consent not
to be unreasonably withheld), or (ii) in the interior of the
Premises which are visible from the outside without Landlord's
prior written consent (such consent not to be withheld if such
signage is consistent with other first class motion picture
theatres in Santa Barbara County and otherwise not to be
unreasonably withheld).  All such signs shall comply with and be
subject to all applicable laws, ordinances, rules, and regulations.
Tenant shall at its expense properly and promptly maintain and
repair its signs, and keep them in a neat and clean condition.
Upon expiration of the Lease, Tenant shall at its expense promptly
remove all signs installed hereunder, unless otherwise specified by
Landlord pursuant to <u>Section 22.1</u>, and shall "cap off" the
electrical wiring thereto.  Tenant shall not use any strobes or
other flashing lights visible outside the Premises or any sound
reproduction or transmission equipment (including, without
limitation, musical instruments, loud speakers, phonographs, radios
and television receivers or transmitters) which can be heard
outside the Premises.  Tenant shall keep its theatre marquee sign,
poster cases and display windows, if any, lighted at all times
during evening hours while the Premises are in operation and open
to the public (subject to applicable legal requirements).

11.2.  <u>Tenant's Sign on Pylon</u>.  Subject to approval by
the County of Santa Barbara, Tenant shall have the right to install
a sign panel containing Tenant's trade name on one of the sign
pylons to be erected and installed by Landlord in the Shopping
Center.  Tenant shall have the right to select the sign pylon on
which Tenant's sign panel shall be installed.  Tenant's sign panel
shall be no smaller than other sign panels on such sign pylon of
tenants whose premises contain the same or smaller Gross Leasable
Area.  Tenant's sign panel (including height, size, design, color
and materials) shall be subject to the prior written approval of
Landlord (and any change to Tenant's sign panel shall be subject to
the prior written approval of Landlord). Landlord hereby represents

- 30 -

and warrants to Tenant that, as of the date of this Lease, Landlord is the Developer under the Declaration; and, further, that unless and until Landlord gives notice to Tenant that Landlord is no longer the Developer under the Declaration, Tenant shall be entitled to assume conclusively that any approval by Landlord of Tenant's signage under this Article 11 constitutes the approval of the Developer as required under the Declaration. Landlord shall be responsible for the cost of construction and installation of such sign pylon; and Tenant shall be responsible for the cost of fabrication and installation of its sign panel to be installed on the sign pylon. Landlord shall properly and promptly maintain and repair in a neat and clean condition and illuminate the sign pylons and all sign panels thereon at Landlord's expense (but the costs which Landlord thereby incurs may be included in Common Area Maintenance Costs).

11.3. Off-Premises Displays and Advertising. Tenant shall not keep or display any merchandise on, or otherwise obstruct in any manner, the sidewalks or areaways adjacent to the Premises without Landlord's consent made in Landlord's sole discretion. Tenant shall not distribute, display, paint or place handbills, bumper stickers or other advertising anywhere in the Shopping Center or on any vehicle parked in the parking areas of the Shopping Center or on public streets adjacent to the Shopping Center.

11.4. Advertising and Promotion.

11.4.1. Shopping Center Promotions. Intentionally omitted.

11.4.2. Promotion Fee. Each Lease Year Tenant shall pay to Landlord the amount of $500, which amount Landlord shall apply to advertising, promotion, public relations and administrative expenses related to the Shopping Center. Such amount shall be prorated for partial Lease Years. Tenant shall pay such amount for the first Lease Year concurrently with payment by Tenant of the first installment of Fixed Minimum Rent to be paid by Tenant hereunder; and for succeeding Lease Years Tenant shall pay such amount with the installment of Fixed Minimum Rent due on January 1. Such amount shall be recalculated effective as of the end of the fifth Lease Year and at the end of every fifth Lease Year thereafter by multiplying said amount by a fraction, the numerator of which is the CPI (as defined hereinbelow) published most recently prior to the particular recalculation date and the denominator of which shall be the CPI published most recently before the date of this Lease; provided, however, in no event shall such amount be less after such recalculation than it was prior to such recalculation. As used herein, the term CPI means the Consumer Price Index for All Urban Consumers (All Items) for the San Francisco-Oakland-San Jose Metropolitan Area (1982-1984 = 100) published by the Bureau of Labor Statistics of the United States Department of Labor (the "BLS"). In the event that the BLS ceases to publish the CPI, Landlord and Tenant will agree upon some alternate method of recalculating such amount with the goal of

-31-

yielding approximately the same recalculation thereof that would have resulted had the BLS not ceased to publish the CPI.

    11.4.3.  <u>Christmas Promotions</u>.  Intentionally omitted.

  12.  <u>COMMON AREA</u>.

   12.1 <u>Maintenance and Repair</u>. Landlord shall, throughout the Term, keep and maintain all of the Common Area in good order, condition and repair (ordinary wear and tear, damage due to casualty and condemnation or taking excepted) and in compliance with all applicable legal requirements. Notwithstanding the foregoing, if and during such time that the Owners of the various Parcels (as such terms are defined in the Declaration) in the Shopping Center are each obligated to maintain the Common Area on their respective Parcels, Landlord's obligation with respect to maintenance of the Common Area on any Parcel which is not owned by Landlord shall be to use commercially reasonable efforts to cause the Owner of such Parcel to maintain the Common Area on such Parcel in accordance with the requirements of the Declaration. Landlord may at any time delegate such maintenance, or any portion thereof, to any other third party, affiliated or non-affiliated, upon such terms and conditions as Landlord deems necessary or appropriate. Landlord shall at all times maintain the Common Area in a manner consistent with other comparable first class Shopping Centers in the Southern California area. Without limiting the generality of the foregoing, Landlord shall maintain in good operating condition facilities to adequately light all of the Common Area (including the driveways and drive aisles which provide access to and from the Premises) until 10 P.M. each evening. Tenant acknowledges that Landlord is required under the Conditions of Approval to phase down the lighting to twenty percent (20%) of normal brightness by 9:30 P.M. for that portion of the Parking Area which is primarily used by customers and employees of the major retail tenants in the Shopping Center and by 12:30 A.M. for that portion of the Parking Area which is primarily used by customers and employees of Tenant and other entertainment uses in the Shopping Center.

   12.2.  <u>Payment by Tenant of Proportionate Share</u>. Commencing on the Term Commencement Date and continuing thereafter throughout the Term, Tenant shall pay to Landlord in the manner hereinafter provided, the Management Fee and Tenant's Proportionate Share of Common Area Maintenance Costs as additional rent.

   12.2.1. <u>Method of Payment</u>. On the first day of each month during each Lease Year, Tenant shall pay in advance one-twelfth (1/12th) of the amount which Landlord estimates as the Management Fee and Tenant's Proportionate Share of Common Area Maintenance Costs for such Lease Year. Within ninety (90) days after the end of each Lease Year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's Proportionate Share of Common Area Maintenance Costs and the Management Fee. If the amount paid by Tenant during such Lease Year is less than Tenant's Proportionate Share of Common Area Maintenance Costs and the Management Fee as

shown by Landlord's statement, then Tenant shall pay the difference within twenty (20) days after the date of Landlord's statement; if the amount paid by Tenant during such Lease Year is more than Tenant's Proportionate Share of Common Area Maintenance Costs and the Management Fee as shown by such statement, then Tenant shall receive a credit on future payments of Common Area Maintenance Costs hereunder for the amount of such excess.

12.2.2.  Adjustments During Lease Year.  If at any time it appears to Landlord that Common Area Maintenance Costs for any Lease Year will exceed Landlord's estimate thereof, then Landlord shall have the right by notice to Tenant to revise the estimated monthly amount payable by Tenant hereunder and subsequent payments of Tenant's estimated Proportionate Share of Common Area Maintenance Costs and the Management Fee hereunder shall be increased based upon such revised statement.

12.2.3.  Prorations.  For the Lease Years in which the Term commences and expires, Common Area Maintenance Costs shall be prorated based on the number of days of the calendar year the Term is in effect.

12.2.4.  Landlord's Records.  Landlord shall keep records showing in reasonable detail all Common Area Maintenance Costs.  Landlord shall keep such records for any Lease Year for at least three (3) years following the end of such Lease Year.  Within a period of three (3) years after the end of any Lease Year, Tenant shall have the right to inspect (and, at Tenant's expense, copy and audit) such records for such Lease Year.  Such inspection shall take place only after Tenant has given Landlord at least fifteen (15) days prior written request for such inspection; and such inspection shall take place during regular business hours at the offices of Landlord or its designated agent.  If an audit of the Common Area Maintenance Costs for any Lease Year discloses that such costs were overstated by more than five percent (5%), Landlord shall be responsible for all reasonable costs incurred by Tenant in connection with the review and audit of such Common Area Maintenance Costs.

12.3.  Non-Exclusive Rights in Common Area; Rules and Regulations.  Subject to the terms and conditions of this Lease and such rules and regulations as Landlord may from time to time promulgate, Landlord hereby grants to Tenant, and its invitees and licensees, the non-exclusive right to use the Common Area during the Term for ingress and egress to and from the Premises and for parking motor vehicles of Tenant's invitees and licensees in the Parking Area (subject to Section 12.4 below).  Tenant and its invitees and licensees shall observe all reasonable rules and regulations which Landlord may from time to time or at any time promulgate for observance by all tenants of the Shopping Center and their employees and other invitees and licensees with respect to the use, operation and maintenance of the Common Area or any other portion of the Shopping Center.  Any such rules and regulations shall be binding upon Tenant and its licensees and invitees upon Landlord's delivery of a copy thereof to Tenant.  Tenant shall not use the Common Area, or any other portion of the Shopping Center,

- 33 -

for any purpose, or allow therein any use, other than that specifically allowed hereunder or under any rules and regulations promulgated by Landlord hereunder. Notwithstanding anything to the contrary set forth in this Lease, Landlord shall have the right to grant an easement or easements for parking, storm drainage, roadway or pedestrian or vehicle ingress or egress for the benefit of property not within the Shopping Center if and to the extent necessary to comply with the governmental entitlements for the development of the Shopping Center (and Tenant shall consent as necessary to any and all such easements);
Landlord hereby agrees to use commercially reasonably efforts to ensure that any such easement or easements which Landlord is required to grant for parking shall not create an undue burden upon the Parking Area.

12.4. _Tenant Parking_. Tenant and its officers, employees, agents and contractors shall park their motor vehicles only in that portion of the Parking Area which Landlord shall from time to time designate hereunder. Tenant shall not at any time park, or permit the parking, of motor vehicles in truck passageways or adjacent to any service delivery facility so as to interfere in any way with the use thereof by others, nor shall Tenant at any time park, or permit the parking, of motor vehicles of its suppliers or vendors in the Parking Area.

12.5. _Changes to Shopping Center_. Landlord shall not make any change in or to that portion of the Common Area shown as Tenant's Control Area on _Exhibit A_ hereto which would in any material respect adversely affect the conduct of business by Tenant in the Premises, the parking available in such area to customers or patrons of Tenant's business in the Premises, or the access to and from the Premises and streets adjacent to the Shopping Center without the prior written consent of Tenant (such consent not to be unreasonably withheld). With the exception of the restriction set forth in the immediately preceding sentence, Landlord shall have the right, at any time and from time to time: (i) to designate or improve any portion of the Shopping Center as Common Area and/or Parking Area; (ii) to change the shape, size, location, number and extent of the improvements shown on _Exhibit A_; and (iii) to add any property or improvements to the Shopping Center, including one or more parking decks or parking structures.

12.6. _Alternative Common Area Maintenance Provisions_. Notwithstanding anything to the contrary set forth here and above in this _Article 12_, if Landlord at any time during the Lease Term is not the Developer under the Declaration, and if the developer elects to operate, maintain and repair the Common Area of the Shopping Center pursuant to _Section 5.1(b)_ of the Declaration, then, in lieu of paying Tenant's Proportionate Share of Common Area Maintenance Costs as provided hereinabove in this _Article 12_, Tenant shall, for as long as such election by Developer remains effective, reimburse Landlord as additional rent for Tenant's pro-rata share of Landlord's Proportionate Share (as Owner under the Declaration of Landlord's Parcel) of all Common Area Maintenance Costs and the Management fee (as such terms are defined in the Declaration) in the manner and at the times specified for payment

- 34-

by Landlord to Developer of Landlord's Proportionate Share under the Declaration.  For purposes of such reimbursement, Tenant's pro-rata share of Landlord's Proportionate Share shall be the ratio expressed as a percentage of the Gross Leasable Area of the Premises to the Gross Leasable Area of Landlord's Parcel.

13.  <u>ASSIGNMENT AND SUBLETTING</u>.

13.1.  <u>Landlord Consent Required</u>.  Tenant shall not assign this Lease, or any rights, duties or obligations hereunder, and Tenant shall not sublet all or any portion of the Premises, without Landlord's prior written consent, which shall not be unreasonably withheld or delayed, and then only subject to the terms and conditions hereinafter set forth.  In considering any request for consent to a proposed assignment or sublease, Landlord shall make its decision based on the standards and criteria set forth in <u>Section 13.4</u>.  Prior to effectuating any such assignment or sublease, Tenant shall notify Landlord in writing of the name and address of the proposed assignee or sublessee, and deliver to Landlord with such notice a true and complete copy of the proposed assignment agreement or sublease, such other information or documents as may be necessary or appropriate to enable Landlord to determine the qualifications of the proposed assignee or sublessee and the compliance of such transaction with the requirements of this <u>Article 13</u>, and a request that Landlord consent thereto.  Within thirty (30) days after the receipt of such written notice, Landlord shall either:  (i) consent in writing to such proposed assignment or sublease, subject to the terms and conditions hereinafter set forth; or (ii) notify Tenant in writing that Landlord refuses such consent.

13.2.  <u>Rent</u>.  If Landlord consents to an assignment pursuant to <u>Section 13.1</u>, then the amount of Fixed Minimum Rent shall be increased, effective as of date of the assignment transaction, monthly by the greater of (i) the average amount of estimated Percentage Rent paid by Tenant for the twelve (12) months immediately preceding such assignment or (ii) the amount of Percentage Rent paid for the Lease Year immediately preceding such assignment.  The Fixed Minimum Rent, as so adjusted, shall continue to be subject to adjustment pursuant to <u>Section 4.1</u>, based upon the same percentage increase as specified in, or would be determined pursuant to, <u>Section 4.1</u>.  In addition, if Landlord consents to an assignment under <u>Section 13.1</u>, then at Landlord's sole election, all or any portion of the excess sums otherwise payable by Landlord to Tenant due to overpayments by Tenant of estimated Percentage Rent or Common Area Maintenance Costs, shall be applied in payment of sums then due under this Lease from Tenant but not yet paid, in such order of priority as Landlord, in its sole discretion, may determine.

13.3.  <u>Payment of Consideration to Landlord</u>.  If Landlord consents to any assignment or sublease hereunder, then Tenant shall pay to Landlord, immediately upon Tenant's receipt thereof, fifty percent (50%) of any and all "consideration" (as defined below) received by Tenant on account of such transaction, howsoever the same may be denominated or characterized, to the extent that such

-35-

consideration exceeds:  (i) the unamortized cost of any leasehold
improvements to the Premises made and paid for by Tenant; (ii) in
the case of subleases, the pro rata portion of the Fixed Minimum
Rent and other charges payable by Tenant hereunder attributable to
the sublet portion of the Premises, based on the Gross Leasable
Area of the Premises and the Gross Leasable Area of the sublet
portion of the Premises; (iii) customary and reasonable brokerage
commissions incurred in connection with the assignment or sublease;
and (iv) all customary and reasonable costs and expenses incurred
by Tenant in connection with the assignment or sublease, including
without limitation, attorney's fees.   As used herein,
"consideration" includes any and all consideration received by
Tenant on account of such assignment or subletting, but only to the
extent that such consideration reflects or is attributable (either
directly or indirectly) to the value of the Premises or Tenant's
leasehold estate under this Lease, including rent and all other
amounts payable in connection with such transaction, but
specifically excluding the good will attributable to Tenant's
business operations in the Premises, to the extent that such good
will does not reflect the value of the Premises or Tenant's
leasehold estate under this Lease.

13.4. <u>Parameters of Landlord's Consent</u>.  Landlord shall
have the right to base its consent to any assignment or sublease
hereunder upon such factors and considerations as Landlord
reasonably deems relevant or material to the proposed assignment or
sublease transaction and the best interest of the Shopping Center
operations.   Without limiting the generality of the foregoing,
Tenant acknowledges that it shall be reasonable for Landlord to
withhold its consent to any assignment or sublease transaction
hereunder if Tenant has not demonstrated that:  (i) the proposed
assignee or sublessee is financially responsible, with sufficient
net worth and net current assets, properly and successfully to
operate its business in the Premises and meet the financial and
other obligations of this Lease; (ii) the proposed assignee or
sublessee possesses sound and good business judgment, reputation
and experience, and proven management skills in the operation of a
business or businesses substantially similar to the uses permitted
in the Premises under <u>Section 5.1</u>; (iii) Landlord has no reasonable
basis for disapproving the use to be made of the Premises by the
proposed assignee or subtenant under <u>Section 5.1</u> above (and that
the use to be made of the Premises by the proposed assignee or
subtenant conforms with the use limitations and requirements
specified in <u>Section 5.4</u> above); (iv) the Rent theretofore paid by
Tenant under this Lease will not be reduced or adversely affected
as a result of the assignment or sublease transaction; and (v) the
assignment or sublease will not breach any covenant of Landlord
respecting radius, location, use or exclusivity in any other lease,
financing agreement or other agreement relating to the Shopping
Center or contained in this Lease.

13.5. <u>Other Terms and Conditions</u>.  Each assignment or
sublease to which Landlord consents shall be effected by an
instrument in writing in form and substance satisfactory to
Landlord, and shall be executed by both Tenant and the assignee or
sublessee, as the case may be.  One (1) executed copy of such

- 36 -

written instrument shall be delivered to Landlord concurrently with the consummation of such assignment or sublease transaction.  Each assignee or sublessee in any assignment or sublease transaction hereunder shall agree in such written instrument to assume and be bound by all of the terms, covenants, conditions and obligations of this Lease.  Every sublease shall be subject and subordinate to the provisions of this Lease.  If Landlord consents to an assignment or sublease, Tenant shall remain liable for all its obligations and liabilities under this Lease, including the payment of Fixed Minimum Rent and Percentage Rent.  No consent by Landlord to any modification, amendment or termination of this Lease, or extension, waiver or modification of payment or any other obligations under this Lease, or any other action of Landlord with respect to any assignee or sublessee, or the insolvency, bankruptcy or default of any such assignee or sublessee, shall affect the continuing liability of Tenant for its obligations and liabilities hereunder, and Tenant waives any defense arising out of or based thereon; provided, however, that Tenant shall not be bound by any modification or amendment of this Lease which increases Tenant's obligations or liabilities unless Tenant shall have given its written consent to such modification or amendment. Tenant shall reimburse Landlord for all reasonable costs and expenses incurred in connection with any proposed assignment or sublease transaction hereunder, including attorneys' fees and lease administration fees incurred by Landlord in connection with the processing and documentation of any requested assignment or subletting, regardless of whether such transaction is actually consummated.

13.6.  **Landlord Rights and Remedies**.  Any assignment or sublease made without Landlord's prior written consent hereunder shall, at Landlord's sole election, be void and shall constitute an Event of Default by Tenant under this Lease.  No consent to any assignment or sublease shall constitute a waiver of the provisions of this **Article 13** with respect to any subsequent assignment or sublease, and each assignment or sublease by Tenant hereunder shall require Landlord's prior written consent pursuant to this **Article 13**.  If Tenant purports to assign this Lease, or sublease all or any portion of the Premises, or permit any person or persons other than Tenant to occupy the Premises, without Landlord's prior written consent given hereunder, Landlord may collect rent from the person or persons then or thereafter occupying the Premises and apply the net amount collected to the Rent hereunder, but no such collection shall be deemed a waiver of this **Article 13**, or the acceptance of any such purported assignee, sublessee or occupant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.

13.7.  **Permitted Assignments/Subleases**.  Notwithstanding any contrary provision of this **Article 13**, Tenant shall have the right to consummate the following transactions without the prior consent of (but with notice to) Landlord: (i) grant a license or concession for the conduct within the Premises of activities permitted under **Article 5** of this Lease;  (ii) engage in so-called "Four Wall" deals whereby the Premises or any part thereof is permitted to be used by others on a limited engagement basis for any part of the uses permitted to be made by Tenant, for a period

- 37 -

not exceeding sixty (60) days per auditorium in any Lease Year;
(iii) assign this Lease or sublet the Premises to (a) any person or
entity which controls, is controlled by, or is under common control
with Tenant and remains in such relationship with Tenant for the
remainder of the Lease Term, (b) any person or entity which
acquires all or substantially all of the business and assets of
Tenant pertaining to the Santa Barbara market; or (c) any person or
entity which operates a chain of motion picture theatres having at
least fifty (50) theatre screens and gross revenues of at least
$15,000,000 per year and has a net worth calculated in accordance
with generally accepted accounting principles of at least
$25,000,00 all as demonstrated to Landlord's reasonable
satisfaction.   For purposes hereof, control shall mean the
ownership of, and/or the right to vote, stock possessing at least
fifty percent (50%) of the total combined interest in the entity in
question, or of the voting power of all classes of capital stock
issued, outstanding and entitled to vote for the election of
directors.  The terms and provisions of <u>Section 13.3</u> of this Lease
shall not be applicable to a transaction described in this <u>Section
13.7</u>.

    13.8.   <u>Encumbrances</u>.   Tenant shall not encumber,
hypothecate or transfer as security (whether by conditional
assignment or sublease, or otherwise) this Lease, or any Tenant's
rights, duties or obligations hereunder, without first having
obtained Landlord's written approval (which approval shall not be
unreasonably withheld, conditioned or delayed); and Tenant's
interest under this Lease may not be assigned in connection with
the foreclosure or exercise of a private power of sale or exercise
of any other similar remedy under any such encumbrance,
hypothecation or transfer except to a person or entity which shall
have been approved in writing by Landlord (such approval not to be
unreasonably withheld, conditioned or delayed).

    14.  <u>ACCESS</u>.

    14.1.  <u>Access to Premises</u>.  Landlord and its designees
shall have the right to enter upon the Premises at all reasonable
hours after reasonable notice (and in emergencies at all times
after such notice, which may be oral, as may be practicable under
the circumstances) without diminution or abatement of Rent or
liability to Tenant: (i) to make such installations, repairs,
improvements, additions or alterations to the Premises and/or the
Building as Landlord is required or permitted to make under this
Lease (and for such purpose to erect scaffolding and other
necessary structures where required by the character of the work to
be performed, always providing that the entrance to the Premises is
not thereby blocked); (ii) to inspect the same or show the same to
prospective lenders or buyers; (iii) to serve or post any notice
required or permitted under the provisions of this Lease or by law;
and (iv) to verify that Tenant is performing its obligations with
respect to maintenance, repair and/or restoration of the Premises
as required under this Lease.

    14.2.  <u>Access for Prospective Tenants</u>.  For the period
commencing one hundred eighty (180) days prior to the end of the

- 38-

Term, Landlord shall have access to the Premises upon reasonable notice to Tenant to exhibit the same to prospective tenants.

15.  <u>EMINENT DOMAIN</u>.

15.1.  <u>Entire or Substantial Taking</u>.  If the Premises or the Tenant's Control Area (as shown on <u>Exhibit A</u> hereto)  or any substantial portion thereof is taken for any public or quasi-public use under any statute or by right of eminent domain, or by purchase in lieu thereof, so that in Tenant's judgment (reasonably exercised) reconstruction of the Premises by Tenant (or the reconstruction of the Tenant's Control Area by Landlord) will not result in the Premises being reasonably suited for Tenant's continued occupancy for the uses and purposes for which the Premises are leased, then Tenant shall have the option to terminate this Lease by giving notice to Landlord of its election to do so on or before the date which is thirty (30) days after possession of the Premises, or part thereof, is taken.

15.2.  <u>Partial Taking</u>.  If any part of the Premises is so taken and this Lease is not terminated pursuant to <u>Section 15.1</u> above, then this Lease shall, as to the part of the Premises so taken, terminate as of the date possession of such part is taken, and the Fixed Minimum Rent then in effect shall be reduced in the proportion that the Gross Leasable Area of the part taken (less any additions thereto by reason of any reconstruction) bears to the original Gross Leasable Area of the Premises.  If any part of the Premises is so taken and this Lease is not terminated pursuant to <u>Section 15.1</u> above, Landlord shall, at Landlord's expense, restore the Premises to a complete unit as similar as reasonably possible in design, character and quality to the Premises as it existed before such taking, provided that (a) the cost of such work does not exceed the amount of the award available to Landlord as a result of the taking, and (b) the scope of such work shall not exceed that done by Landlord in originally constructing the Premises.  Such restoration work shall be performed in accordance with the original plans and specifications for the Premises approved by the parties pursuant to <u>Exhibit C</u> hereto or with such other plans and specifications as shall have been approved by Tenant, such approval not to be unreasonably withheld, conditioned or delayed.  A just part of the Fixed Minimum Rent shall be abated during such restoration to the extent that such restoration substantially interferes with the conduct of Tenant's business in the Premises.

15.3.  <u>Disposition of Award</u>.  All compensation or damages awarded or paid for any taking hereunder shall belong to and be the property of Landlord, except that Landlord shall not be entitled to any portion of the award attributable to the value of Tenant's leasehold estate, and Landlord shall not be entitled to any award made to Tenant for loss of business or the unamortized cost of Tenant's stock, trade fixtures or moving and relocation costs, if any, or if the Lease has been terminated as a result of such taking pursuant to <u>Section 15.1</u> above, alterations or additions paid by Tenant.  Tenant waives all right to any portion of the award

-39-

belonging to Landlord hereunder, and grants to Landlord all of Tenant's rights therein.

15.4.  Further Assurance.  Each party shall execute and deliver to the other all documents or instruments that may be necessary or appropriate to effectuate the provisions hereof.

15.5.  Tenant Waivers.  Tenant hereby waives any right at law or in equity which it might have to terminate this Lease on account of any taking by condemnation or power of eminent domain affecting the Premises and/or the Shopping Center, including all rights under California Code of Civil Procedure Sections 1265.120 and 1265.130, and any similar or successor statues.  In the event of such a taking, the rights, duties and obligations of the parties shall be governed solely by the applicable provisions of this Lease with respect thereto.

16.  DAMAGE OR DESTRUCTION.

16.1.  Landlord to Rebuild.  If the Premises are damaged or destroyed by fire or other casualty insured under Landlord's casualty insurance carried under Section 6.2, then Landlord shall repair the damaged or destroyed portions of the Premises, unless Landlord elects to terminate this Lease pursuant to Section 16.2.1 below.  If such damage or destruction substantially interferes with the conduct of Tenant's business in the Premises, then a just part of the Fixed Minimum Rent shall be abated, to the extent of such interference reasonably attributable to such damage or destruction, until Landlord terminates this Lease pursuant to Section 16.2.1 or 16.2.2 below or until the date which is the earlier of (a) the date upon which Tenant reopens for business or (b) the date which is sixty (60) days after the date upon which Landlord substantially completes the necessary repairs to the Premises, whichever is applicable.

16.2.  Landlord's Options to Terminate.  If the Premises or the Shopping Center are damaged or destroyed by fire or other casualty, Landlord shall have the option to terminate this Lease as follows:

16.2.1.  Damage to Premises.  If (i) the Premises are damaged or destroyed by any casualty not insured under Landlord's casualty insurance carried under Section 6.2 and the cost of repair exceeds $100,000, or (ii) the Premises are damaged or destroyed by any casualty during the last two (2) Lease Years and the extent of the damage or destruction is such that the repair and restoration thereof cannot reasonably be expected to be completed within sixty (60) days following the date of the casualty, then, in either such event, Landlord may elect, in its sole discretion, to (a) repair or rebuild the Premises, or (b) terminate this Lease by giving written notice of such termination to Tenant, unless Tenant agrees to pay the uninsured cost of repair in excess of $100,000 in the case of (i) above. Landlord shall make its election within forty-five (45) days after any such damage or destruction.  Unless Landlord elects to terminate this Lease as provided hereinabove in this Section 16.2.1 (or pursuant to Section

- 40-

16.2.2 below), any damage or destruction to the Premises shall have no effect on this Lease and this Lease shall remain in full force and effect (subject to any abatement of Fixed Minimum Rent under Section 16.1 above), the parties waiving the provisions of any statute or law to the contrary.

16.2.2. <u>Damage to Balance of Shopping Center</u>. If twenty-five percent (25%) or more of the Gross Leasable Area within that portion of the Shopping Center which is shown and designated as Section 16.2.2 Damage Area on <u>Exhibit A</u> hereto is damaged or destroyed by fire or other casualty (whether or not the Premises are damaged by such casualty), Landlord shall have the right by giving written notice to Tenant within sixty (60) days after the date of such damage or destruction, to terminate this Lease, as long as Landlord terminates all other leases of space in the Section 16.2.2 Damage Area. Unless Landlord elects to terminate this Lease as provided hereinabove in this <u>Section 16.2.2</u> (or pursuant to <u>Section 16.2.1</u> above), any damage or destruction to the Shopping Center shall have no effect on this Lease and this Lease shall remain in full force and effect (subject to any abatement of Fixed Minimum Rent pursuant to <u>Section 16.1</u> above), the parties waiving the provisions of any statute or law to the contrary.

16.3. <u>Extent of Landlord's Repair and Rebuilding Obligations</u>. If Landlord is required or elects to repair and rebuild the Premises under this <u>Article 16</u>, Landlord shall commence such work of repair and rebuilding as soon as reasonably possible following the receipt by Landlord of necessary governmental permits and approvals and, if applicable, Landlord's receipt of insurance proceeds and shall prosecute such repair and rebuilding to completion as soon as reasonably possible using all due diligence and continuity. Any repair or rebuilding of the Premises by Landlord shall be made in accordance with the final plans and specifications approved by the parties in accordance with <u>Exhibit C</u> hereto or with such other plans and specifications as shall have been approved in advance by Tenant in writing, such approval not to be unreasonably withheld, conditioned or delayed. All costs and expenses for such repair and rebuilding shall be borne by Landlord. If Landlord elects to repair and rebuild the Premises hereunder, then Tenant shall forthwith replace or repair all of Tenant's signs, trade fixtures, equipment display cases and all other installations made or installed by Tenant under this Lease, regardless of whether paid for by Landlord or Tenant. Tenant shall prosecute its work of repair and reconstruction hereunder with all due diligence and continuity and shall re-open for business in the Premises as soon as reasonably possible after the date of damage or destruction, so that Landlord will be deprived of the benefits of Tenant's business operations in the Premises for as short a time as possible.

16.4. <u>Tenant's Termination Rights</u>. In the case of any damage or destruction to the Premises, within thirty (30) days following the date of such casualty, Landlord shall provide Tenant with an estimate of the time required to repair the damage, which estimate shall be prepared by a reputable architect or contractor reasonably approved by Tenant. If, in the opinion of such

- 41 -

architect or contractor, it will take longer than three hundred
sixty (360) days to rebuild or restore such damage following the
date of the casualty, Tenant may terminate this Lease by written
notice to Landlord of such termination within fifteen (15) days
following receipt of the foregoing estimate.  If the Premises is
damaged during the last two (2) years of the Term and extent of the
damage is such that the repair and restoration thereof is not
expected to be completed within ninety (90) days following the date
of the casualty, then Tenant shall have the right to terminate this
Lease by written notice of termination to Landlord within thirty
(30) days following the date of the casualty.

     16.5.  <u>Tenant Waivers</u>.  Tenant hereby waives any right at
law or in equity which it might have to terminate this Lease on
account of any damage or destruction to the Premises and/or the
Shopping Center, including all rights under California Civil Code
Sections 1932(2) and 1933(4), and any similar or successor
statutes.  In the event of any such damage or destruction, the
rights, duties and obligations of the parties shall be governed
solely by the applicable provisions of this Lease with respect
thereto.

     17.  <u>WAIVER OF CLAIMS; INDEMNITY</u>.

     17.1.  <u>Waiver of Claims</u>.  Except if and to the extent
proximately caused by the negligence or willful misconduct of
Landlord, or its employees, agents or contractors, or the breach by
Landlord of any obligation under this Lease, and subject to <u>Section
6.5</u> above, Landlord shall not be liable to Tenant, or to any other
person or entity, for any loss or damage to Tenant's property or
personal injury or death, arising out of or in connection with any
cause of any nature whatsoever, including any act or omission of
tenants, owners or other occupants of the Shopping Center, or of
adjacent property, or of their employees, agents, contractors,
licensees or invitees, or the public, or fire, accident, riot,
strike, labor disputes, or acts of God.

     17.2.  <u>Indemnity</u>.  Subject to <u>Section 6.5</u> above, Tenant
shall indemnify, defend, protect and hold Landlord harmless from
and against any and all claims, proceedings, damages, causes of
action, liability, costs or expense (including attorneys' fees)
arising from or in connection with or caused by:  (i) any act,
omission or negligence of Tenant or any Permittee of Tenant, or
their respective contractors, agents, servants or employees,
wheresoever the same may occur; (ii) except if and to the extent
proximately caused by the negligence or willful misconduct of
Landlord, or its employees, agents or contractors, or the breach of
this Lease by Landlord, any accident, injury, death or damage to
any person or property occurring in, on or about the Premises, or
any part thereof, or (iii) any breach or default by Tenant or any
Permittee of Tenant in the performance of any of Tenant's
obligations hereunder.  Subject to <u>Section 6.5</u> above, Landlord
shall indemnify, defend, protect and hold Tenant harmless from and
against any and all claims, proceedings, damages, causes of action,

- 42-

liability, costs or expense (including reasonable attorneys' fees) arising from or in connection with or caused by: (i) any occurrence in or upon any of the Common Area of the Shopping Center unless and to the extent the same is caused by the negligence or willful misconduct of Tenant, its agents, employees or contractors; (ii) any negligence or willful misconduct of Landlord, its employees, agents or contractors; or (iii) any breach or default by Landlord in the performance of any of Landlord's obligations under this Lease.

18. <u>NOTICES</u>.

18.1. <u>Procedure</u>. All notices, consents, waivers or other communications which this Lease requires or permits either party to give to the other shall be in writing and shall be given by personal delivery (including delivery by messenger or overnight courier service) or by registered or certified mail, return receipt requested, or by Federal Express, Express Mail or other reputable overnight courier, postage prepaid, addressed to the parties as set forth below:

|  |  |
|---|---|
| To Landlord: | Camino Real Limited Liability Company<br>c/o Wynmark<br>6500 Hollister Avenue, Suite 100<br>Goleta, California 93117 |
| To Tenant: | Metropolitan Theatres Corporation<br>8727 West Third Street<br>Los Angeles, CA 90048-3897<br>Attention: Mr. David Corwin |

Either party may change its mailing address at any time by giving written notice of such change to the other party in the manner provided herein at least ten (10) days prior to the date such change is effected. Rent and other charges required by this Lease to be paid by Tenant to Landlord shall be delivered to Landlord at Landlord's address set forth above or to such other address as Landlord may from time to time specify by written notice to Tenant. All notices under this Lease shall be deemed given, received, made or communicated on the date personal delivery is effected or, if mailed, on the delivery date or attempted delivery date shown on the return receipt.

18.2. <u>Multiple Tenants</u>. If there is more than one (1) person or entity comprising Tenant, then all notices, consents, waivers or other communications under this Lease may be given by or to any one of such persons or entities, and when so served, shall have the same force and effect as if given or served upon each such person or entity, and each such person or entity hereby designates each other such person or entity as its agent for service of such notices in accordance herewith.

- 43 -

19. <u>DEFAULT AND REMEDIES</u>.

19.1. <u>Notice to Tenant</u>. Upon the occurrence of any Event of Default, Landlord shall give Tenant written notice thereof, specifying the Event of Default and the provisions of this Lease breached by Tenant and Tenant shall have the right to cure such Event of Default within the time periods, if any, hereinafter specified.

19.1.1. <u>Vacation or Abandonment</u>. For vacation or abandonment of the Premises, within fifteen (15) days after Landlord's notice.

19.1.2. <u>Nonpayment of Money</u>. For failure to pay Fixed Minimum Rent, Percentage Rent or any other charge or sum, within ten (10) days after Landlord's notice

19.1.3. <u>Other Obligations</u>. For failure to perform or observe any obligation, agreement or covenant under this Lease, other than nonpayment of monies, within thirty (30) days after Landlord's notice. Notwithstanding the foregoing 30-day period, if such failure of performance or observance is of such a nature that it cannot be cured within thirty (30) days after Landlord's notice, then Tenant shall not be in default provided that it has commenced to perform or observe such obligation, agreement or covenant within such 30-day period and is diligently pursuing performance thereof.

19.2. <u>Landlord's Remedies</u>. On the occurrence of an Event of Default which Tenant fails to cure after notice and expiration of the cure period, if any, specified above, Landlord shall have the right: (i) to terminate this Lease and, at any time thereafter, recover possession of the Premises and, by any lawful means, expel and remove Tenant and any other person occupying the Premises, without prejudice to any of the remedies that Landlord may have under this Lease or at law or in equity; or (ii) to continue this Lease in effect for so long as Landlord does not terminate Tenant's right to possession, and enforce all Landlord's rights and remedies under this Lease, including the right to recover Fixed Minimum Rent as it becomes due. Acts of maintenance, preservation or efforts to lease the Premises, or the appointment of a receiver upon application of Landlord to protect Landlord's interest under this Lease shall not constitute an election to terminate Tenant's right to possession unless specific written notice of such termination is given to Tenant. In the event Landlord terminates this Lease or Tenant's right to possession, Landlord may store any property of Tenant located in the Premises in a public warehouse or elsewhere at Tenant's expense or otherwise dispose of such property in the manner provided by law. If Landlord does not terminate this Lease hereunder, then Tenant shall continue to pay currently all amounts payable by Tenant under this Lease. Any and all monthly deficiencies so payable by Tenant shall be paid on each due date for Fixed Minimum Rent. Election of any remedy provided hereinabove by Landlord shall not preclude a subsequent election by Landlord of any other remedy available under this Lease or under applicable law.

-44-

19.3.  <u>Damages Upon Termination</u>.  If Landlord terminates this Lease pursuant to <u>Section 19.2</u>, then Landlord may exercise all rights and remedies available to a Landlord at law or in equity, including the right to recover from Tenant: (i) the worth at the time of award of the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of the award exceeds the amount of loss of Rent that the Tenant proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom.  The "worth at the time of award" of the amounts referred to in clauses (i) and (ii) shall be computed with Interest.  The "worth at the time of award" of the amount referred to in clause (iii) shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco, California, plus one percent (1%).  As used herein, "time of award" shall mean either the date upon which Tenant pays to Landlord the amount recoverable by Landlord as hereinabove set forth, or the date of entry of any determination, order or judgment, of any court or other legally constituted body determining the amount recoverable, whichever first occurs.

19.4.  <u>Computation of Rent and Other Amounts for Purposes of Default</u>.  For purposes of clause (iii) of <u>Section 19.3</u>, unpaid Rent for the balance of the term after the time of award shall consist of the sum of:  (i) the total Fixed Minimum Rent for the balance of the Term, plus (ii) a computation of Taxes and Common Area Maintenance Costs for the balance of the Term, the assumed Taxes and Common Area Maintenance Costs for the Lease Year in which the Event of Default occurs and each future Lease Year to be equal to the Taxes and Common Area Maintenance Costs for the Lease Year prior to the Lease Year in which the Event of Default occurs, compounded at a per annum rate equal to the mean average rate of inflation for the preceding five (5) Lease Years as determined by the CPI as defined in <u>Section 11.3.2</u> above, plus (iii) a computation of Percentage Rent for the balance of the Term equal to the average Percentage Rent payable by Tenant for the three (3) Lease Years immediately prior to the occurrence of the Event of Default (or if less than three (3) Lease Years have then elapsed, the number actually then elapsed), compounded at a per annum rate equal to the mean average rate of inflation for such preceding three (3) Lease Years based on the CPI, plus (iv) any portion of the Tenant's Pro Rata Share of the Eligible Building Costs required to be paid by Tenant to Landlord under <u>Exhibit C</u> which remains unpaid.

19.5.  <u>Waiver of Statutory Notice Periods</u>.  The notice periods after Events of Default specified in <u>Section 19.1</u> shall be exclusive of any other notice period provided by law with respect

- 45 -

to any such Event of Default, and Tenant hereby waives any right under law to any other notice period now or hereinafter enacted.

19.6. <u>Landlord's Right to Perform on Tenant's Breach</u>. In addition to any other right or remedy of Landlord hereunder, upon the occurrence of an Event of Default and without waiving or releasing Tenant from any obligation of Tenant hereunder, Landlord may (but shall not be required to) cure such Event of Default for the account of Tenant. Landlord shall not be responsible or liable to Tenant for any loss or damage that may be caused to Tenant's stock or business by reason of effecting cure hereunder. All sums paid by Landlord and all costs and expenses incurred by Landlord in connection with such cure (including attorneys' fees), together with Interest thereon from the respective dates of Landlord's incurrence of each item of cost or expense, shall be payable by Tenant on demand.

19.7. <u>Receiver</u>. If a receiver is appointed in any action by Landlord against Tenant on account of any Event of Default, such receiver may take possession of any personal property belonging to Tenant and used in the business conducted on the Premises, and the entry or possession by such a receiver shall not constitute an eviction of Tenant from the Premises or any portion thereof. Tenant shall indemnify, defend, protect and hold Landlord harmless from any damages, causes of action, liability, cost or expense (including attorneys' fees) arising out of or in connection with the entry by such receiver and the taking of possession of the Premises and/or such personal property. Neither the application for the appointment of such receiver, nor the appointment itself, shall constitute an election on Landlord's part to terminate this Lease, unless written notice of such election is given by Landlord to Tenant hereunder.

19.8. <u>Landlord's Defaults</u>.

19.8.1. <u>Notice and Cure; Landlord's Liability; Tenant's Right of Cure and Offset</u>. If Landlord fails to perform any of its obligations under this Lease, then Tenant shall give Landlord written notice thereof, specifying with particularity the breach claimed by Tenant. Landlord shall have the right to cure such breach during the 30-day period following receipt of Tenant's notice hereunder, unless such breach cannot reasonably be cured within such 30-day period, in which event Landlord shall not be in default under this Lease if Landlord commences such cure within such 30-day period and thereafter diligently prosecutes the same to completion. If the Premises, or any portion thereof, are at any time subject to any mortgage or a deed of trust, and Tenant has been given written notice of the notice address of such lender, Tenant shall serve on the mortgagee or beneficiary thereunder concurrent copies of any notice of default served on Landlord hereunder. If Landlord fails to cure any noticed breach hereunder within the time period provided in this <u>Section 19.8.1</u>, then any such mortgagee or beneficiary shall have an additional thirty (30) days within which to cure Landlord's breach, plus such additional time as may be necessary to perfect such mortgagee's or beneficiary's rights and remedies under its mortgage or deed of

- 46 -

trust (including foreclosure proceedings or the appointment of a receiver) and complete cure in fact. If and when such mortgagee or beneficiary has rendered performance on behalf of Landlord, Landlord's breach shall be deemed cured; and such mortgage or beneficiary shall not be required to cure any breach by Landlord which cannot reasonably be cured by such mortgagee or beneficiary. Notwithstanding anything to the contrary under applicable law, Tenant shall have no right to terminate this Lease during the notice and cure periods hereunder. If Landlord fails to cure its breach hereunder (or such breach is not cured by a mortgagee or beneficiary as herein specified), then Landlord shall be liable to Tenant only for Tenant's direct damages caused thereby and Tenant waives any rights to recover consequential damages on account thereof. Notwithstanding the foregoing, if Tenant at any time gives notice to Landlord that Landlord has failed to perform any of its maintenance or repair obligations under <u>Section 9.1</u> above and such default is not cured by Landlord (or its mortgagee or beneficiary) within the time periods specified hereinabove, Tenant shall have the right to undertake the necessary repair or maintenance; and, in the event Tenant so undertakes such work, all reasonable out-of-pocket costs thereby incurred by Tenant shall be reimbursed by Landlord within thirty (30) days after receipt by Landlord of a written demand from Tenant for reimbursement (accompanied by reasonable substantiation of the costs to be reimbursed). If Landlord fails to reimburse Tenant for such costs within said 30-day period, Tenant shall have the right to recover such costs (plus Interest on the unrecovered balance thereof from the date Tenant incurred such costs until Tenant recovers the same in full) in the form of an offset or credit against Fixed Minimum Rent; provided, however, that the amount of such offset or credit in any month shall not exceed twenty-five percent (25%) of the amount of the Fixed Minimum Rent payable by Tenant for such month, but any balance of such costs (plus interest) not so recovered may be offset or credited against the Fixed Minimum Rent payable by Tenant in the next succeeding month or months (subject to the limitation on amount specified hereinabove) until the same is fully recovered by Tenant or until the date of expiration or termination of the this Lease on which the entire unrecovered balance of such costs (plus Interest) shall be due and payable in full by Landlord to Tenant.

19.8.2. <u>Limitations on Tenant's Remedies</u>. Landlord shall never be personally liable under this Lease; Tenant shall look solely to Landlord's interest in the Shopping Center for any recovery of damages for any breach by Landlord of this Lease, or any recovery of any judgment from Landlord. None of the members comprising Landlord (whether partners, shareholders, officers, directors, trustees, employees, beneficiaries or otherwise) shall ever be personally liable for any such judgment. There shall be no levy of execution against any assets of Landlord, other than the Shopping Center, or the assets of such members on account of any liability of Landlord hereunder. Tenant hereby waives any right of recovery or satisfaction of any judgment against Landlord or its members, except as to Landlord's interest in the Shopping Center as herein specified.

19.8.3.  <u>Waivers</u>.  No waiver by Tenant of any default by Landlord in the performance of any of its obligations under this Lease shall be effective or binding as against Tenant unless such waiver is contained in a writing signed by the Tenant; and no such waiver shall be implied from any omission by Tenant to take action with respect to any breach or default by Landlord hereunder.  No waiver by Tenant of any breach or default by Landlord shall be deemed to be a waiver of any subsequent or other breach or default by Landlord.

19.9.  <u>Waiver; Remedies Cumulative</u>.  Failure of Landlord to declare an Event of Default immediately upon the occurrence thereof, or delay in taking any action in connection therewith, shall not waive such Event of Default, but Landlord shall have the right to declare any such Event of Default at any time thereafter.  No waiver by Landlord of an Event of Default,

or any agreement, term, covenant or condition contained in this Lease, shall be effective or binding on Landlord unless made in writing and no such waiver shall be implied from any omission by Landlord to take action with respect to such Event of Default or other such matter.  No express written waiver by Landlord of any Event of Default, or other such matter, shall affect or cover any other Event of Default, matter or period of time, other than the Event of Default, matter and/or period of time specified in such express waiver.  One or more written waivers by Landlord of any Event of Default, or other matter, shall not be deemed to be a waiver of any subsequent Event of Default, or other matter, in the performance of the same provision of this Lease.  Acceptance of Rent by Landlord hereunder shall not, in and of itself, constitute a waiver of any Event of Default or of any agreement, term, covenant or condition of this Lease, except as to the payment of Rent so accepted, regardless of Landlord's knowledge of any concurrent Event of Default or matter.  All of the remedies permitted or available to Landlord under this Lease, or at law or in equity, shall be cumulative and not alternative; invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy.

19.10.  <u>Interest</u>.  Any sum due and payable to Landlord under the terms of this Lease which is not paid when due shall bear Interest from the date when the same becomes due and payable by the provisions hereof until paid.

19.11.  <u>No Accord and Satisfaction</u>.  No payment by Tenant, or receipt by Landlord, of a lesser amount than the Rent herein provided shall be deemed to be other than on account of the earliest Rent due and payable hereunder, nor shall any endorsement or statement on any check, or letter accompanying any check or payment, as Rent be deemed an accord and satisfaction.  Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other right or remedy provided in this Lease.

- 48-

19.12.  <u>Waiver of Right of Redemption</u>.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future law in the event Tenant is evicted or dispossessed from the Premises for any cause, or in the event Landlord obtains possession of the Premises by reason of the commission by Tenant of an Event of Default or otherwise.

## 20.  <u>SUBORDINATION AND ATTORNMENT; ESTOPPEL CERTIFICATES</u>.

20.1.  <u>Subordination</u>.  This Lease, and all of Tenant's rights and interest in the leasehold estate hereunder, shall be subject and subordinate to any mortgages or deeds of trust that now encumber, or may hereafter be placed upon, the Premises, and to the rights of the mortgagees or beneficiaries thereunder, any and all advances made or to be made thereunder, the interest thereon, and all modifications, renewals, replacements and extensions thereof.  If any such mortgagee or beneficiary so elects in writing, then this Lease shall be superior to the lien of the mortgage or deed of trust held by such mortgagee or beneficiary, whether this Lease is dated or recorded before or after such mortgage or trust deed.  Upon request, Tenant shall promptly execute and deliver to Landlord, or any such mortgagee or beneficiary, any documents or instruments required by any of them to evidence subordination of this Lease hereunder or to make this Lease prior to the lien of any mortgage or deed of trust as herein specified.  If Tenant fails or refuses to do so within ten (10) days after written request therefor by Landlord or such mortgagee or beneficiary, such failure or refusal shall constitute an Event of Default by Tenant, but shall in no way affect the validity or enforceability of the subordination to or by the mortgage or deed of trust held by such mortgagee or beneficiary.  As used herein, the terms "mortgage" and "deed of trust" include any sale and leaseback transaction in which Landlord sells and simultaneously leases back all or any portion of its interest in the Shopping Center.  Notwithstanding any contrary provision of this <u>Article 20</u>, within sixty (60) days following the date of this Lease, Landlord shall deliver to Tenant non-disturbance agreements from the ground lessor under the Ground Lease (as defined in <u>Section 2.4</u> above) and from the holder of any indebtedness of Landlord which is secured by the lien of a mortgage or deed of trust recorded against Landlord's interest as ground lessee under the Ground Lease prior to the date of this Lease which shall be substantially in the form of <u>Exhibits E</u> and <u>F</u> hereto (and Tenant agrees to execute such agreements in recordable form within five (5) days after receipt of written request to do so from Landlord and prior to execution of same by any other party thereto).  If Landlord fails to deliver the foregoing non-disturbance agreements within such 60-day period, then Tenant shall have the right to terminate this Lease.  In addition, in no event shall Tenant be obligated to pay any Rent under this Lease until Tenant receives the foregoing non-disturbance agreements.  Landlord hereby represents and warrants to Tenant that any mortgage or deed of trust of record as of the date of this Lease encumbering the fee title of the ground lessor under the Ground Lease in and to the Property is subordinate to the Ground Lease.  Although Landlord shall not be obligated to provide a non-disturbance agreement from any lender which acquires a security interest which is recorded

- 49-

after the date hereof encumbering the fee title of the ground
lessor under the Ground Lease in and to the Property (or
encumbering Landlord's interest under the Ground Lease), the
subordination provisions set forth in this Article 20, and Tenant's
obligations pertaining thereto, shall not be effective unless
Tenant receives a non-disturbance agreement from any such lender
substantially in the form of Exhibit F hereto or in such other
commercially reasonable form as may be required by such lender.

20.2.  Attornment by Tenant.  Upon enforcement of any
rights or remedies under any mortgage or deed of trust to which
this Lease is subordinated (including proceedings for judicial
foreclosure or a trustee's sale pursuant to a power of sale, or
deed in lieu of foreclosure delivered by Landlord to the mortgagee
or beneficiary thereunder), Tenant shall, at the election of the
purchaser or transferee under such right or remedy, attorn to and
recognize such purchaser or transferee as Tenant's Landlord under
this Lease.  Tenant shall execute and deliver any document or
instrument required by such purchaser or transferee confirming the
attornment hereunder.

20.3.  Subordination to Further Covenants and Easements.
If the Shopping Center shall be encumbered by any easements,
covenants, conditions and/or restrictions of record (collectively,
"CC&R's") agreed to, granted and/or imposed after the date of this
Lease by Landlord and/or any other third party (including a "REA"),
then this Lease, and all of Tenant's rights and interest in the
leasehold estate hereunder, is and shall be subject and subordinate
thereto and to any and all amendments or modifications at any time
made thereto.  Tenant shall promptly upon request execute and
deliver to Landlord any documents or instruments required to
evidence the subordination of this Lease hereunder.  If Tenant
fails or refuses to do so within ten (10) days after written
request therefor by Landlord, such failure or refusal shall
constitute an Event of Default by Tenant, which shall in no way
affect the validity or enforceability of this subordination as
herein specified.  Notwithstanding any contrary provision of this
Section 20.3, Landlord represents and warrants to Tenant that
Tenant shall not be obligated to subordinate this Lease to, nor
shall Tenant be obligated by or bound under, any future CC&R's
which would in any material respect increase the obligations to be
performed by Tenant under this Lease or diminish the rights to be
enjoyed by Tenant under this Lease.  Landlord further represents
and warrants to Tenant that, except for the Declaration (as defined
in Section 5.7 above), there are no other CC&R's of record as of
the date of this Lease encumbering the Shopping Center.

20.4.  Estoppel Certificates.  Tenant shall, at any time
and from time to time, upon not less than twenty (20) days' prior
written request by Landlord, execute, acknowledge and deliver to
Landlord, or Landlord's designee, a statement in writing
certifying:  (i) the date of this Lease, and that this Lease is
unmodified and in full force and effect (or if there have been
modifications, that the same are in full force and effect as
modified and stating the date[s] and identifying the nature of the
modification[s]);  (ii) the amounts of pre-paid Rent and other

- 50-

charges (if any) and the dates to which such Rent and other charges have been paid, if applicable; (iii) and confirming Tenant's acceptance of the Premises and the Term Commencement Date; (iv) that Tenant is not in default under this Lease, that no notice has been received by or delivered to Tenant of any Event of Default which has not been cured, except as to Events of Default specified in the certificate, and that no event has occurred which but for the giving of required notice or expiration of an applicable grace period would constitute an Event of Default by Tenant under this Lease; (v) that, to the best of Tenant's knowledge Landlord is not in default in the performance of any of its obligations under this Lease, that Tenant has given no notice of default to Landlord and that, to the best of Tenant's knowledge, no event has occurred which but for the giving of required notice or expiration of an applicable grace period would constitute a default by Landlord hereunder (or specifying any default by Landlord claimed by Tenant, or any event which with the giving of notice or expiration of a grace period would constitute a default by Landlord); and (vi) such other matters as may reasonably be requested by Landlord or any designee of Landlord.  Any statement delivered pursuant to this Section 20.4 may be relied upon by any prospective purchaser, encumbrancer, mortgagee, or assignee of any encumbrancee or mortgagee, of the Premises or the Shopping Center, or any portion of or interest in either.  If Tenant fails or refuses to give a statement or certificate within the time provided hereunder after proper notice and request, then the information contained in such statement or certificate shall be deemed correct for all purposes, but Landlord shall have the right to treat such failure or refusal as an Event of Default under this Lease and seek recourse to all rights and remedies granted herein.

21.  INTENTIONALLY OMITTED.

22.  SURRENDER OF PREMISES ON TERMINATION.

22.1.  Condition of Premises.  On the last day or sooner termination of the Term, Tenant shall quit and surrender the Premises to Landlord, broom clean, in good order, condition and repair as required by Section 9.2, together with all alterations, additions and improvements made in, to or on the Premises, except movable furniture and Tenant's trade fixtures installed at the expense of Tenant, except that Landlord shall have the right to request Tenant by written notice not later than thirty (30) days before the end of the Term if Landlord desires to have the Premises, or any part or parts thereof, restored to the condition of the Premises prior to the making by Tenant of any alteration, addition or improvements as to which Landlord informed Tenant at the time of Landlord's consent to such alteration that Landlord would require to be removed at the end of the Term, and if Landlord shall so desire, then Tenant shall, at Tenant's sole cost and expense, so restore the Premises, or such part or parts thereof, before the end of the Term.  On or before the end of the Term, Tenant shall remove all its personal property from the Premises, and all property of Tenant not removed hereunder shall be deemed, at Landlord's option, to be abandoned by Tenant and Landlord may store such property in Tenant's name at Tenant's expense, and/or

- 51 -

dispose of the same in any manner permitted by law. Tenant shall repair any and all damage to the Premises caused by Tenant's removal of its furniture, trade fixtures or property hereunder. If the Premises are not surrendered as of the end of the Term in the manner and condition herein specified, Tenant shall indemnify, defend, protect and hold Landlord harmless from and against all loss, liability, cost or expense (including attorneys' fees) resulting from or caused by Tenant's delay or failure in so surrendering the Premises, including any claims made by any succeeding tenant due to such delay or failure.

22.2.  <u>Effect of Surrender on Subleases</u>.  The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination of this Lease prior to the expiration of the Term, shall not work a merger and shall, at the sole option of Landlord, either terminate any or all existing subleases or subtenancies, or operate as an assignment to it of all or any such subleases or subtenancies.

23.  <u>SALE OF PREMISES BY LANDLORD</u>.  In the event of any sale or exchange by the Landlord of its interest in the Premises and assignment by Landlord of this Lease, Landlord shall be released and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease accruing after the consummation of such sale or exchange and assignment.

24.  <u>BROKERS</u>.  Tenant warrants and represents that Tenant has not had any dealings with any realtor, broker or agent, in connection with the negotiation of this Lease and shall pay, indemnify, defend, protect and hold Landlord harmless from and against any cost, expense or liability (including reasonable attorneys' fees) on account of or in connection with any compensation, commissions or charges claimed by any realtor, broker or agent with respect to this Lease and/or the negotiation thereof. Landlord warrants and represents that Landlord has not had any dealings with any realtor, broker or agent in connection with the negotiation of this Lease and shall pay, indemnify, defend, protect and hold Tenant harmless from and against any cost, expense or liability (including reasonable attorneys' fees) on account of or in connection with any compensation, commissions or charges claimed by any realtor, broker or agent with respect to this Lease and/or the negotiation thereof.

25.  <u>HAZARDOUS MATERIALS</u>.

25.1.  <u>Landlord's Representations</u>.  Prior to the date of this Lease, Landlord has delivered to Tenant (a) a Phase I Environmental Site Assessment, dated November 26, 1997, prepared by EMG, and (b) a Phase I Environmental Site Assessment, dated October, 1994, prepared by Fugro/KC Geotechnical Associates (collectively, "Landlord's Environmental Report"). Tenant hereby approves Landlord's Environmental Report. Landlord represents and warrants to Tenant that, except as disclosed in Landlord's Environmental Report, Landlord has no actual knowledge or notice of any Hazardous Materials on, under or about the Premises or the Shopping Center.

- 52 -

25.2. <u>Tenant's Obligations</u>.

25.2.1. <u>Covenants</u>. If Tenant obtains knowledge of the actual or suspected Release of Hazardous Materials on, about, under or in the Premises or the Shopping Center, then Tenant shall promptly notify Landlord of same. Neither Tenant nor any Permittee of Tenant nor any of their respective agents, employees or contractors, shall cause or permit Hazardous Materials to be brought upon, kept or used in, on, or about the Premises or the Shopping Center except in strict compliance with all Environmental Laws. Tenant shall immediately notify Landlord of any inquiry, test, investigation or enforcement proceeding by or against Tenant involving the Premises and/or the Shopping Center and a Hazardous Material. If and in the manner required by the County of Santa Barbara Tenant shall prepare a Hazardous Materials Business Plan that shall include a list of the types and quantities of Hazardous Materials, if any, to be stored in the Premises and to comply with any and all related Hazardous Material building design specifications.

25.2.2. <u>Indemnification</u>. If Tenant breaches any obligation set forth in this Article or if a Release is caused or permitted by Tenant or any Permittee of Tenant or any of their respective agents, employees or contractors, then Tenant shall indemnify, defend, protect and hold Landlord, its employees, agents, partners, partners of partners, officers and directors, harmless from and against any and all claims, actions, suits, proceedings, losses, costs, damages, liabilities (including without limitation sums paid in settlement of claims), deficiencies, fines, penalties, punitive damages or expenses (including, without limitation, reasonable attorneys' fees and consultants' fees, investigation and laboratory fees, court costs and litigation expenses) which arise during or after the Term as a result of such breach or Release. This indemnity shall include, without limitation (i) any damage, liability, fine, penalty, punitive damage, cost or expense arising from or out of any claim, action, suit or proceeding for personal injury (including sickness, disease, or death), tangible property damage, nuisance, pollution, contamination, leak, spill, Release or other effect on the environment, and (ii) the cost of any required or necessary investigation, repair, clean-up, treatment or decontamination of the Premises or the Shopping Center and the preparation and implementation of any closure, disposal, remedial or other required actions in connection with the Premises or the Shopping Center.

25.3. <u>Landlord's Obligations with Respect to Hazardous Materials</u>. Landlord shall defend, indemnify, protect and hold Tenant harmless from and against any and all claims, causes of action, damages, fines, judgments, penalties, costs, liabilities, losses or expenses (including, without limitation, reasonable attorneys' fees and reasonable investigative and discovery costs) arising during or after the Lease Term on account of or in connection with: (a) the presence of any Hazardous Materials in, on, or about the Premises or the Shopping Center resulting from an act or omission of Landlord, its employees, agents or contractors; or (b) any breach by Landlord of its obligations set forth in this

- 53 -

<u>Section 25.3</u>.  To the extent not covered by the foregoing covenant of indemnification, Landlord hereby agrees to defend, indemnify, protect and hold Tenant harmless from and against the costs of remediating or otherwise pursuing legal closure necessary because of the presence, use, generation, storage or release of Hazardous Materials in, on, under or above the Shopping Center (including any fines, penalties and reasonable attorneys' fees and investigative costs associated therewith), unless the Hazardous Materials are present as a result of an act or omission of Tenant, its agents, employees, contractors, subtenants, licensees or concessionaires. Without limiting the foregoing, such covenants of indemnification by Landlord shall include any and all costs incurred with any investigations of the Shopping Center or any cleanup, removal, repair, remediation, detoxification or restoration, and the preparation of any closure or other plans (including the "Plan", defined later) required or permitted by any governmental authority. In the event of the presence in violation of any applicable Environmental Laws of any Hazardous Materials in, on, or about the Shopping Center which are not the result of an act or omission of Tenant, its agents, employees, contractors, subtenants, licensees or concessionaires, Landlord shall promptly conduct a site assessment, take any immediate action required by any applicable Environmental Laws for containment of such Hazardous Materials, and prepare and implement a plan for the removal or other remediation of such Hazardous Materials in compliance with all applicable Environmental Laws (the "Plan"); provided, however, that if such Hazardous Materials are present as result of an act or omission of a person or entity other than Landlord, its agents, contractors or employees, Landlord shall not be responsible for the removal or remediation of such Hazardous Materials as long as Landlord uses commercially reasonable efforts and all due diligence to cause the responsible party promptly to remove or otherwise remediate the Hazardous Materials in compliance with all applicable Environmental Laws.

26.  <u>GENERAL PROVISIONS</u>.

26.1.  <u>No Partnership</u>.  Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between Landlord and Tenant, and neither the method of computation of Rent, nor any other provision contained in this Lease, nor any acts of the parties shall be deemed to create any relationship between Landlord and Tenant, other than the relationship of Landlord and tenant.

26.2.  <u>Binding on Successors</u>.  Subject to the provisions of <u>Article 13</u> regarding assignment and subletting by Tenant, all of the provisions, terms, covenants and conditions of this Lease shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors and assigns.

F:\DATA\VERGES\WYNMARK\METRO\LEASE.8.wpd

26.3. <u>Attorneys' Fees</u>. If either party brings any action or proceeding against the other (including any cross-complaint, counterclaim or third party claim) to enforce or interpret this Lease, or otherwise arising out of this Lease, the prevailing party in such action or proceeding shall be entitled to its costs and expenses of suit, including reasonable attorneys' fees and accountants' fees, which shall be payable whether or not such action or proceeding is prosecuted to judgment. "Prevailing party" within the meaning of this <u>Section 26.3</u> shall include a party who dismisses an action for recovery hereunder in exchange for payment of the sums allegedly due, performance of covenants allegedly breached or consideration substantially equal to the relief sought in the action.

26.4. <u>Governing Law</u>. This Lease shall be construed and enforced in accordance with the laws of the State in which the Shopping Center is located.

26.5. <u>Force Majeure</u>. If either party is delayed in the performance of any covenant of this Lease because of acts of the other party, unusual action of the elements, war, riot, strikes, lockouts, labor disputes, inability to procure or general shortage of labor or materials in the normal channels of trade, or delay in governmental action or inaction where action is required (financial inability, imprudent management or negligence excepted), then such performance shall be excused for the period of the delay and the period of such performance shall be extended for a period equivalent to the period of such delay, except that the foregoing shall in no way affect or apply to (i) Tenant's obligation to pay Rent or any other sums or amounts hereunder, or (ii) the length of the Term. Nothing herein contained shall excuse a party from exercising all due diligence and taking all necessary actions possible under the circumstances to terminate any delaying cause herein specified at the earliest feasible time.

26.6. <u>Construction and Interpretation</u>. Except in <u>Article 1</u> ("Definitions"), the headings or titles to the Articles and Sections of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part thereof. The use in this Lease of the words "including," "such as" or words of similar import when following any general term, statement or matter shall not be construed to limit such statement, term or matter to the specific items or matters, whether or not language of non-limitation such as "without limitation" is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such statement, term or matter. References to a "month" or "months" refer to whole or partial calendar months during the Term. All provisions of this Lease

- 55-

have been negotiated by Landlord and Tenant at arm's length and neither party shall be deemed the scrivener of this Lease. This Lease shall not be construed for or against either party by reason of the authorship or alleged authorship of any provision hereof or by reason of the status of the respective parties as Landlord or Tenant.

26.7. <u>Entire Agreement; Amendment</u>. This Lease, together with the Exhibits hereto, contains all the representations and the entire understanding between the parties with respect to the subject matter hereof. The Exhibits to this Lease are fully incorporated herein by reference. Any prior negotiations, correspondence, memoranda, agreements, representations or warranties are replaced in total by this Lease and the Exhibits hereto. All reliance with respect to representations and warranties is solely upon the representations and warranties contained in this Lease. This Lease may be modified or amended only by an agreement in writing signed by each of the parties.

26.8. <u>References</u>. All references herein to a given Article, Section, subsection or Exhibit refer to the Articles, Sections, subsections and Exhibits of this Lease. References to a party or parties shall refer to Landlord or Tenant, or both, as the context may require.

26.9. <u>Warranties of Authority</u>. Tenant warrants and represents to Landlord that Tenant has the full right, power and authority to enter into this Lease and has obtained all necessary consents and approvals from its partners, officers, board of directors or other members required under the documents governing its affairs in order to consummate the Lease transaction contemplated hereby. The persons executing this Lease on behalf of Tenant have the full right, power and authority so to do and affirm the foregoing warranty on behalf of Tenant and on their own behalf. Landlord warrants and represents to Tenant that Landlord has the full right, power and authority to enter into this Lease and has obtained all necessary consents and approvals from its members required under the documents governing its affairs in order to consummate the Lease transaction contemplated hereby. The persons executing this Lease on behalf of Landlord have the full right, power and authority so to do and affirm the foregoing warranty on behalf of Landlord and on their own behalf.

26.10. <u>Severability</u>. If any term or provision of this Lease, or the application thereof to any person or circumstance, shall be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby.

F:\DATA\VERGES\WYNMARK\METRO\LEASE.8.wpd

26.11.    <u>Other Tenancies</u>.    Landlord reserves the absolute right to effect such other tenancies in the Shopping Center as Landlord, in the exercise of its sole discretion, determines may best promote the interests of the Shopping Center.    Landlord does not warrant, represent or covenant, expressly or impliedly, that any specific lease or leases now or hereafter in effect between Landlord and any third parties will be continued in effect for any period of time, or that any other person or entity shall during the Term continue to occupy or occupy any space as a tenant in the Shopping Center; Tenant, in entering into this Lease, has not relied upon the continued existence or operation of any other tenant or tenants within the Shopping Center, notwithstanding any other lease or leases in existence at the time of execution hereof or commencement of the Term.

26.12.    <u>Time of Essence</u>.    Time is of the essence with respect to the performance of each of the covenants and agreements contained in this Lease.

26.13.    <u>Survival</u>.    Each of the indemnity obligations set forth in this Lease and all liabilities which may then have accrued shall survive and be enforceable following the expiration or prior termination of this Lease.    In the event of any action or proceeding to enforce any such indemnities or liabilities following the expiration or termination of this Lease, <u>Section 26.3</u> shall be applicable thereto.

26.14.    <u>Recordation</u>.    At Tenant's request, the parties shall record a memorandum of lease in the form attached hereto as <u>Exhibit G</u> in the Official Records of Santa Barbara County to evidence this Lease.    Tenant shall, within ten (10) days after expiration or termination of this Lease, execute and deliver to Landlord in recordable form such instrument as

- 57 -

Landlord may reasonably request in order to expunge said memorandum of lease from title to the Shopping Center.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date and year first above written.

**LANDLORD:**                                    **TENANT:**

CAMINO REAL LIMITED LIABILITY          METROPOLITAN THEATRES
COMPANY, a California                          CORPORATION, a California
limited liability company                       corporation

By: Wynpac I Limited Liability          By: _____
    Company, a California                Its: _President_____
    limited liability company,
    a Member
                                         By: _____
                                         Its: _Executive Vice President_

    _____
    Mark D. Linehan, President

- 58-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Three Embarcadero Center, 12th Floor, San Francisco, CA  94111

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF MARK D. LINEHAN**
**SUPPORTING OBJECTION OF CAMINO REAL LIMITED LIABILITY COMPANY TO MOTION OF DEBTOR AND**
**DEBTOR IN POSSESSION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
May 28, 2024_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:
ALL PARTIES ARE ECF RECIPIENTS

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 28, 2024 | Cynthia Lynch | /s/ Cynthia Lynch |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

## ECF SERVICE LIST

financials@aegonam.com; evelina.gentry@akerman.com; steven.paletz@akerman.com; branchd@ballardspahr.com; elan.levey@usdoj.gov; gil.hopenstand@sba.gov; dbailey@arb.bank; zarnighiann@ballardspahr.com; info@bankdirectcapital.com; dustin.nirschl@bbklaw.com; mark@wynmark.com; sfonseca@calexico.ca.gov; mgomez@calexico.ca.gov; lreyes@calexico.ca.gov; kurena@calexico.ca.gov; mgarcia@calexico.ca.gov; egarcia@calexico.ca.gov; imunoz@calexico.ca.gov; info@santabarbaraca.gov; sclark@santabarbaraca.gov; nechoice@constellation.com; stephen.byers@constellation.com; lee.turner@constellation.com; choicecompliance@constellation.com; investorrelations@constellation.com; home@constellation.com; info@crockerair.com; ryan.eisenbraun@brinkmanre.com; natalie.vessey@cbre.com; kellyd9941@cox.net; hvaughn@icee.com; jeff.sauer@ifinancial.com; lew@landaunet.com; douglas.flahaut@afslaw.com; diana@rblaw.com; jclark@oconnorcochran.com; moconnor@oconnorcochran.com; david.s.shevitz@usdoj.gov; ron.maroko@usdoj.gov; everett.l.green@usdoj.gov; ar@royalcorporation.com; corporatesecretary@edisonintl.com; claims@sce.com; customerservice@sgproof.com; crosby@investecre.com; melanie.villani@pfgc.com; karl@wildhorsemarketplace.com